Cocheyse J. GRIFFIN, Mignon D. Griffin, Naja D. Griffin and L. Francis Griffin, Jr., infants, by and through L. Francis Griffin, their father and next friend, and all other of the plaintiffs, Appellants,

v.

COUNTY SCHOOL BOARD OF PRINCE EDWARD COUNTY, VIRGINIA, et al., Appellees.

No. 10191.

United States Court of Appeals Fourth Circuit.

Argued Feb. 7, 1966.

Decided June 20, 1966.

Haynsworth, C. J., and Boreman, Circuit Judge, dissented.

Henry L. Marsh, III, Richmond, Va., (S. W. Tucker, Willard H. Douglas, Jr., Richmond, Va., and Otto L. Tucker, Alexandria, Va., on brief), for appellants.

J. Segar Gravatt, Blackstone, Va. (William F. Watkins, Jr., Farmville, Va., John F. Kay, Jr., Richmond, Va., C. F. Hicks, Gloucester, Va., Denny, Valentine & Davenport, Richmond, Va., and DeHardit, Martin & Hicks, Gloucester, Va., on the brief), for appellees.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and BELL, sitting en banc.

ALBERT V. BRYAN, Circuit Judge:

A judgment of civil contempt upon the Board of Supervisors of Prince Edward County and its members is moved for by the appellants-plaintiffs. The ground of the motion is that the Board disbursed public funds to private segregated schools while the right to do so was under consideration by this court. A remedial order requiring the Board to restore these moneys to the County Treasurer is also asked. We grant the motion.

The episode developed in the enforcement of decrees of the District Court reopening the Prince Edward County public schools. The history of the litigation is laid out, ab ovo usque ad mala, in Griffin v. County School Board, 377 U.S. 218, 224, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). There the facts of the present controversy are related, commencing with the District Court's injunction dated November 16, 1961. This injunction was issued on the supplemental complaint of the Negro children and parents who were plain-

tiffs in the District Court and are the appellants here.

Specifically, the injunction commanded the Board and the State not to pay out further funds in tuition grants while the public schools of Prince Edward County remained closed. Allen v. County School Board, 198 F.Supp. 497, 503–504 (E.D. Va. August 25, 1961). The grants had been used for the support of Prince Edward County Educational Foundation, a privately organized corporation conducting a school for white children only. The Court refrained at the time from passing on the County's right to refuse to operate its public schools until the question could be ruled on by the State courts.

With no ruling in the State courts by the summer of 1962, the District Court resumed consideration of the issue, ordered the schools reopened and continued the injunction of tuition grants until the schools were reopened. Allen v. County School Board, 207 F.Supp. 349 (E.D.Va. July 25, 1962). On appeal this decree was stayed by the Court of Appeals awaiting decision in a case then pending in the Supreme Court of Appeals of Virginia. Griffin v. Board of Supervisors, 322 F.2d 332 (4 Cir. 1963). The abstention order was reversed in Griffin v. County School Board, supra, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256, and the injunction and reopening orders of the District Court approved. Upon receipt of the mandate, the District Court set a hearing for June 17, 1964 to formulate a decree thereon.

This hearing resulted in an order to Prince Edward's Board of Supervisors to appropriate, by June 25, 1964, such moneys as were reasonably necessary to open and maintain the public schools on a nondiscriminatory basis, beginning with the 1964 fall term. In obedience the Board arranged to open the public schools, voted appropriations for them and voted also a larger sum for 1964–65 session tuition grants. On June 29, 1964 the plaintiffs moved the District Court to enjoin permanently the processing of tuition grants and to require the Board to augment the sums available for public schools.

With the schools now open, on July 1, 1964 the State Board of Education authorized the reimbursement of parents, to the extent of the tuition grants enjoined for the 1963–64 session, for the amounts they had paid for their children's school attendance in private schools during that session. Thereupon, plaintiffs obtained a temporary injunction barring the payment retroactively of any tuition grants until the hearing on the motion for the permanent injunction, then set for July 9, 1964. The Board agreed to a permanent injunction of the proposed reimbursement of 1963–64 grants. However, the Court declined to enjoin *future* grants and an appeal was noted on July 17, 1964 to this refusal. On July 28, 1964 the appellants moved this court to accelerate the appeal.

As we were then not in session, the Chief Judge requested the Clerk to ask the Board of Supervisors to stipulate that no tuition grants would be paid pending the appeal. On August 4, 1964 the Clerk transmitted this message to the office of the Attorney General of Virginia. In reply the Clerk was told "during the late evening of August 4", that the Board would not make the stipulation. The next morning the Clerk explained that a satisfactory stipulation would be an agreement that the grants would not be paid before the normal time for processing and paying grants, that is not until after the private schools opened in September 1964.

Meanwhile, during the night of August 4 and early morning of August 5, 1964 the Board met and decided to enlarge substantially the tuition grants for the session 1964–65, and ordered that payment of one-half of the total grants be made before September 1, 1964. That night white parents were notified of the Board's action. Checks totalling about $180,000 were distributed before 9 o'clock A.M. and most of them cashed at that hour, August 5, 1964.

On August 13, 1964 in their appeal, the appellants moved to cite the Board for

contempt of this court and for an order restoring the moneys distributed during the night and morning of August 4–5, 1964. After argument of the appeal in regular course, the District Court was directed to enjoin the Board from paying any tuition grants to send children to private schools so long as these schools remained segregated. Griffin v. Board of Supervisors, 339 F.2d 486, 493 (4 Cir. December 2, 1964).

Our decision did not pass upon the contempt motion, but remanded it to the District Court for "further inquiries into the facts surrounding the payments". The District Judge was authorized to consider also the charge of the appellants that the defendants had in effect paid 1963–64 grants retrospectively, by authorizing and paying increased amounts for 1964–65, and thus were in contempt of the District Judge's order of July 9, 1964.

Pursuant to the remittitur, the District Court on February 8, 1965 cited the individual members of the Board of Supervisors to show cause, if any, why they should not be held in contempt of the District Court for failure to comply with its injunction of July 9, 1964 against the retroactive payment of the 1963–64 grants. The rule came on for hearing April 23, 1965, at which time all of the parties in interest were present in person and represented by counsel. In addition to the facts heretofore recited, the District Judge made the following undisputed findings in regard to the questioned events of July and August 1964:

"The Board of Supervisors of Prince Edward County held a meeting on the morning of August 4, 1964 at which time Warren Scott and four of the Negro citizens appeared and filed an unsigned petition bearing ten hundred four typewritten names requesting that the Board of Supervisors allocate additional funds to be used for the purpose of public education. No action was then taken.

"Shortly after adjournment of the Board meeting, Supervisor Jenkins and Supervisor Steck met with a Mr. Taylor and other interested citizens for the purpose of finding a way to pay the '64–'65 tuition grants prior to the time the Court of Appeals could enter an order staying these payments. (It was then known to Mr. Jenkins and to the other members of the group that there had been discussions between Mr. Gray [counsel for the State Superintendent of Public Instruction] and Mr. Dean [Clerk of the Court of Appeals] in re the possibility of the County agreeing not to make any tuition grant payments during the pendency of the appeal.)

"The Commonwealth Attorney and two other members of the Board of Supervisors were then called. Those assembled agreed that if the Board of Supervisors would increase the tuition grants to $310.00 for high school and $290.00 for elementary school and authorize the immediate payment thereof, this could be done before the Court of Appeals could do anything about it.

"The four Board members and the Commonwealth Attorney then went to the home of the chairman of the Board of Supervisors to advise him of what they had in mind and to determine whether or not a special meeting of the Board of Supervisors could be called the next morning for the purpose of expediting the payment of the '64–'65 tuition grants. The chairman, after being advised by the Board's special counsel * and the Commonwealth Attorney that such a resolution on the part of the Board of Supervisors would be legal, called a special meeting of the Board for 8:00 a. m. August 5th. At that meeting the Board passed the resolution which provided that the grants should be paid half on or before September 1, 1964 and half on or before January 1, 1965.

"In the interim, that is, between the meeting at Chairman Vaughan's house

---

* The appellants note in their brief that Mr. Gravatt, the Special Counsel for the

Board, in fact requested the Board not to pay the grants.

and eight o'clock the next morning, Board Member Jenkins and other members of the citizens' committee made arrangements to telephone the parents of the children then attending the Prince Edward School Foundation schools advising them if they came down that night and made application they could get half the tuition money that morning.

"Some twenty or thirty volunteers assisted the secretary of the Board in processing the applications and making out the necessary checks. County bonds were sold in Richmond the next morning to raise the money necessary for the payment of these checks.

"Twelve hundred seventeen tuition grant applications were filed during the night of August 4–5. All of these applications were for the '64–'65 school year. Each applicant was paid one-half of the amount applied for. Most, if not all, of the applicants were children enrolled in the Prince Edward School Foundation schools for the year '64–'65.

"There being no evidence that the money thus paid covered school years prior to '64–'65, the Court concludes that the payments made August 4–5, 1964 were not violative of the order entered herein July 9, 1964. The show cause order issued against the members of the Board of Supervisors February 8, 1965 will be dismissed, and it is SO ORDERED."

That these acts of the Board of Supervisors constituted a contempt of this court is beyond cavil. The Board undertook to put the money then available for tuition grants—and then wholly subject to its orders—beyond its control as well as that of the court. In doing so the Board took upon itself to decide its right to exercise, in favor of the private school, the Board's general power to appropriate public funds. This use of power was, as the Board was acutely aware, an arrogation of this court's responsibility. Obviously, the aim was to thwart the impact of any adverse decree which might ultimately be forthcoming on the appeal.

In effect it was a "resistance to its [this court's] lawful writ, process, order, rule, decree, or command". 18 U.S.C. § 401 (3). The authorities are quite clear on the point.

The Board would escape the judgment of contempt on the argument that the statute limits the power of the court to violations of orders or decrees then extant. But precedent does not so contract the statute or constrict its intent. Although this court had not issued an injunction against the appropriation of the moneys to tuition grants, the Board knew that if the plaintiffs succeeded this would be its ultimate decree, as in fact it became. That potential decree was thus then within the statute. Furthermore, the appeal was itself a "process" which was alive at the time of the disbursement and was resisted by the disbursement.

In Merrimack River Savings Bank v. Clay Center, 219 U.S. 527, 31 S.Ct. 295, 55 L.Ed. 320 (1911), a temporary injunction had been issued by a Federal District Court to prevent the destruction by a municipality of a public utility's poles and wires, located in the city streets under an authorized franchise. The suit was dismissed on jurisdictional grounds. However, for and during an appeal to the Supreme Court, the injunction was continued in force. On this review the dismissal was upheld. But before the mandate of dismissal had been issued or could issue, and in the period allowed for presenting an application for a rehearing, the city cut down the poles, destroyed a large section of the wires and thus put the utility out of business. This conduct was declared to be contempt of the Supreme Court, Justice Lurton saying at 535–536, 31 S.Ct. at 296:

"It does not necessarily follow that disobedience of such an injunction, intended only to preserve the status quo pending an appeal, may not be regarded as a contempt of the appellate jurisdiction of this court, which might be rendered nugatory by conduct calculated to remove the subject-matter of the appeal beyond its control, or by its destruction. This we need not decide,

since *irrespective of any such injunction actually issued the wilful removal beyond the reach of the court of the subject-matter of the litigation * * [on] appeal * * * is, in and of itself, a contempt of the appellate jurisdiction of this court. * * * Unless* this be so, a reversal of the decree would be but a barren victory, since the very result would have been brought about by the lawless act of the defendants which it was the object of the suit to prevent." (Accent added.)

The contempt power declared in the *Merrimack* case was not suggested to be rooted in the inherent power of the Supreme Court rather than in the statute now embodied in 18 U.S.C. § 401(3). Incidentally, the Court has never excluded itself from the statute. Cf. Ex parte Robinson, 19 Wall. 505, 86 U.S. 505, 509, 22 L.Ed. 205 (1873). But *Merrimack* is not now cited to power. It is cited as warranting our finding that the putting of the subject-matter of this litigation beyond our reach was a defiance of this court, an anticipatory resistance to its ultimate orders or process.

That inferior courts have the same contempt power as the Supreme Court exerted in *Merrimack*, and that similar conduct is contempt of the lower courts, were unequivocally enunciated in Lamb v. Cramer, 285 U.S. 217, 219, 52 S.Ct. 315, 76 L.Ed. 715 (1932). There, as in the case now on review, no injunction or order had been issued restraining disposition of the property in suit. Nevertheless, receipt and possession of a part of the res, pendente lite, by a transferee of the defendant-owner was adjudged a contempt of the trial court. The Court had no difficulty in concluding that there was contempt despite the absence of a current restraining order.

While Lamb v. Cramer, supra, did not specifically mention the statute, the Court obviously did not think it barred prosecution of the transferee for contempt. Essentially, the Court followed the statutory terms—"resistance to its [the court's] lawful writ, process, order, rule, decree, or command"—by not limiting its application to an immediately outstanding precept. The anticipated final judgment was not considered to be presently beyond the contemplation of the statute. Indeed, the contrary is implicit in the opinion. The diversion of the res was held to be contumacious because it "tended to defeat any *decree* which the court *might ultimately* make in the cause". (Accent added.)

Civil and not criminal contempt was the gravamen of Lamb v. Cramer and is here too. This was a predominant consideration of the Supreme Court and probably accounts for no advertence to the contempt statute, which seems worded more appropriately for criminal contempt. The omission means nothing, for the primary reasoning of the Court was that the res was in gremio legis and the conveyance of it in part was a disturbance of the constructive possession of the trial court. Whether the decision in Lamb v. Cramer was founded on this conception of judicial custody or on the statute, of which the Court was hardly unaware, is immaterial. Either ground supports our holding that the Board of Supervisors was in contempt.

The present case is quite different factually from Berry v. Midtown Service Corp., 104 F.2d 107, 122 A.L.R. 1341 (2 Cir. 1939), relied upon by the Board. There the subject-matter disposed of pending appeal was the leviable assets of the judgment debtor-appellant. The Court distinguished that case from ours when it said that the appeal was not "defeated or impaired" by the defendant's assignment. Further distinction is found in its observation that the suit "was not concerned with any specific property", the judgment on appeal merely establishing a general, personal, financial liability.

In our case the disbursement of the moneys seriously impaired the appeal. The suit and the appeal were directed to a specific subject, the Board's right to apply to a certain purpose moneys within its power. The Board assumed the right in utter and wilful disregard of this court's views. As was said in Merrimack

River Savings Bank v. Clay Center, supra, 219 U.S. 527, 535, 31 S.Ct. 295, and again in Lamb v. Cramer, supra, 285 U.S. 217, 52 S.Ct. 315, such conduct constituted contempt although not formally and explicitly under injunction.

We find the Board of Supervisors and its members guilty of civil contempt. Accordingly, the Board and its constituent individuals, namely, W. W. Vaughan, C. W. Gates, H. M. Jenkins, Charles B. Pickett, John C. Steck and H. E. Carwile, Jr., personally and in their own right, will be ordered jointly and severally to restore to the County Treasurer of Prince Edward County, through recapture or otherwise, an amount equal to the disbursements authorized and made by their resolutions of August 4–5, 1964. This cause will be continued for a period of 90 days from this date for report by the Board and its members of what has been done towards compliance with this order, as well as for the passage of such further orders as may appear proper.

■ Another matter on this appeal is the amount allowed appellants' counsel as fees for their services in litigation leading to the reopening of the public schools of Prince Edward County. The District Court fixed the fee at $7,500 and directed that it be paid in the proportions of 50% by the Board of Supervisors of Prince Edward County, 25% by the County School Board and 25% by the State Board of Education. The amount of an allowance of this kind is within the discretion of the District Court, and we would not feel warranted in reviewing it save for a misapprehension of the Court in arriving at its figure.

■ The District Judge stated that he would not award a larger amount because counsel had not followed the Court's suggestion to seek a ruling by the Supreme Court of Appeals of Virginia upon the basic question of whether the County had the right to abandon public schools to avoid the "racial discrimination prohibited by the Fourteenth Amendment". Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

On the assurance of counsel that such a suit would be filed, the District Court abstained, as we have noted ante, for a year from itself passing on the issue. But the question was not submitted to the Virginia court. Indeed, in the suit which they did institute in the State court, the petitioners, appellants here, disavowed the existence of any Federal question at all. Griffin v. Board of Supervisors, 203 Va. 321, 124 S.E.2d 227 (1962); Allen v. County School Board, supra, 207 F.Supp. 349, 350.

In their request for allowances, counsel did not include their services or their expenses in the State action. The reason for not tendering the Federal question to the State court, they now say, was that they believed a review on certiorari to the United States Supreme Court, should the State court's determination be unfavorable, would not be "an adequate substitute" for a District Court decision with permissible appeals. Cf. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 416, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). We cannot think that counsel had this different course in mind when they assured the District Court of their intention to pursue their remedies in the State tribunal.

■ The omission was quite understandably disturbing to the District Judge. However, in the circumstances we do not think counsel should have been penalized by diminution of the award to them. Consequently, we will ask the District Judge to reappraise the value of the legal services without consideration of the reduction factor just discussed. Whatever the ultimate award, we think it ought to be assessed jointly and severally against all defendants, with leave to them to make such division of liability inter se as they deem equitable.

Order accordingly.

HAYNSWORTH, Chief Judge, with whom BOREMAN, Circuit Judge, joins (dissenting):

I find no fault with the decision of my brothers concerning the award of fees for counsel, and I am not in disagreement

that the conduct of the Supervisors was unconscionable. However, I must disagree with the majority in their interpretation of the power of this Court to adjudge parties in contempt.

It is clear that this Court has an inherent power to punish contempts. It was originally defined by the seventeenth section of the Judiciary Act of 1789 as the power to punish by fine or imprisonment all contempts of authority in any cause or hearing before the Court. But the power has since been limited and redefined by the Act of Congress of March 2, 1831, now 18 U.S.C. § 401. The statute prescribes:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

Considerable doubt was expressed in Ex parte Robinson, 19 Wall. 505, 86 U.S. 505, as to whether this statute could limit the contempt power of the Supreme Court, which derives its existence and powers from the Constitution, and it is obvious from *Merrimack* [1] that the Court has since gone beyond the statute. But *Robinson* [2] made it clear that there can be no question about the limiting effect the statute has upon the courts of appeals and the district courts. As courts created, not by the Constitution, but, through the power that document vested in Congress, exercise of their inherent contempt powers must be confined to the bounds that Congress has fixed.

Measuring the facts in the present case by the word of Congress, I am unable to find a basis in the statute for a contempt citation here. Phrases (1) and (2) of the statute are not applicable here. The majority finds, under phrase (3), that there was disobedience or resistance to a lawful writ, process, order, rule, decree, or command of this Court. Yet none in fact existed to be disobeyed or resisted. The plaintiff's sought no temporary restraining order or injunction, and none was issued preventing the action taken by the Supervisors. The stipulation requested of the defendants by this court cannot be expanded to fit into any of the things specified in § 401(3).

The word "process," as used in the statute in its context of writs, orders and decrees, obviously means more than the pendency of an appeal or of some other relevant judicial proceeding. It has been traditionally used to encompass such things as a summons, a subpoena, an attachment, a warrant, a mandate, a levy and, generically, other writs and orders. In the context of other orders and writs, "process" can reasonably be understood to mean no more than the sum of more explicit terms, such as "original process," "summary process," "mesne process" and "final process," all of which clearly refer to papers issuing from the court and embodying its commands or judgments, or notice of them. Construed so expansively as the majority's suggestion of equivalence with the pendency of any relevant judicial proceeding, it would entirely contravene the clearly limiting purpose of the congressional act.

Since the suggested construction of the word "process," as used in the statute, is original with the majority, it has never been treated in any reported opinion. The suggestion is inconsistent with the substantially uniform course of decision, however, while the primary theory of the majority is explicitly at odds with the precedents in this and other courts.

This court declared itself in Ex parte Buskirk, 4 Cir., 72 F. 14. There it was held not only that an anticipatory, partial avoidance of a potential decree was not a

1. Merrimack River Savings Bank v. Clay Center, 219 U.S. 527, 31 S.Ct. 295.

2. Ex parte Robinson, 19 Wall. 505, 86 U.S. 505.

punishable contempt within the confines of the limiting statute; violation of a stipulation made in open court, without which mesne process might, and probably would, have issued, was held not to be. Implicit in the decision is a narrow, literal reading of the word "process."

Buskirk was a party in a judicial proceeding in a district court for a determination of the ownership of a tract of timber. In open court, he entered into a stipulation that none of the timber would be cut until the court had decided the question of ownership. Nevertheless, pending the court's decision, he began cutting the timber and intentionally removed it beyond the reach of the court. This court held because of the statute, "[h]owever reprehensible such conduct * * * may have been * * * it nevertheless did not constitute a contempt to the court or its orders."

My brothers now overrule *Buskirk* without deigning to mention it.

Our own decision in *Buskirk* is not an aberration. It is the exemplar of uniform decision. Four of our sister circuits have embraced the same construction of the statute, and have done so in no uncertain terms.[3] No court of appeals, until now, has toyed with any other reading.

I cannot dismiss all of these holdings on the basis of an asserted distinction of the Second Circuit's decision in *Berry*. The basis of the asserted distinction of *Berry* was not present in the Second Circuit's earlier *Probst* decision upon which *Berry* depended, or in our decision in *Buskirk* or in those of the First, Seventh and Eighth Circuits.

The holding in Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315, is of some comfort to the majority, but I find myself unable to accept it as an authoritative interpretation of a statute which the Supreme Court and the lower courts did not even mention.

Lamb was a lawyer, who, assertedly in payment of accrued legal fees, accepted a transfer of some of the property in litigation, upon which the adverse parties had specific liens. Concurrently, a supplemental bill in equity to require his restoration of the property to the custody of the court was filed and a rule issued against Lamb to show cause why he should not return the property to the custody of the court or be held in contempt. Lamb claimed immunity from service, and the district court upheld him in both cases. In both cases, the Court of Appeals for the Fifth Circuit reversed, holding that service upon Lamb was good, and that the supplemental bill in equity and the citation were each appropriate means to require restoration of the property to the control of the court, and that each means might be pursued concurrently.[4] Lamb appealed both cases to the Supreme Court, which affirmed the Fifth Circuit in each.[5]

Clearly, the only purpose of the citation in *Lamb* was the procurement of the return of property in the actual possession and under the control of the attorney, an officer of the court. It was not to punish him or to compel him to replace out of his own funds dissipated assets or money. The most significant thing about the *Lamb* cases, however, is that attention in both the Court of Appeals for the Fifth Circuit and the Supreme Court was focused upon a very different problem. In neither court was there a citation of the statute with which we are concerned or of the cases which had established a uni-

---

3. Parker v. United States, 1 Cir., 126 F.2d 370, 380; In re Probst, 2 Cir., 205 F. 512; Berry v. Midtown Service Corp., 2 Cir., 104 F.2d 107; In re Sixth & Wisconsin Tower, 7 Cir., 108 F.2d 538; Dakota Corp. v. Slope County, 8 Cir., 75 F.2d 584; and see United States v. Day, C.C. N.J., 6 Am.L.Reg. 632, 25 Fed.Cas.No. 14,934, p. 793; In re Rice, C.C.Ala., 181 F. 217.

4. Schmitt v. Lamb, 5 Cir., 48 F.2d 533 (the case arising from the supplemental bill in equity), and Cramer v. Lamb, 5 Cir., 48 F.2d 537 (the case arising upon the citation).

5. Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315 (the case arising upon the citation) and Lamb v. Schmitt, Receiver, 285 U.S. 222, 52 S.Ct. 317, 761 L.Ed. 720 (the case arising upon the supplemental bill in equity).

form interpretation of it. The Supreme Court wrote in Lamb v. Cramer as if the affront had been to itself. One can only suppose that it did so because the statute had not been called to its attention,[6] for the Supreme Court had made it perfectly clear in *Robinson*[7] that the subordinate, statutory federal courts are subject to the statute, and that their powers to punish contempts are effectively limited by it.

If the holding in Lamb may be regarded as an interpretation of the unmentioned statute, one may more reasonably conclude that it was an application of § 401 (2) rather than § 401(3) with which, alone, we are concerned.[8]

The large issue in this case was the constitutionality of a continuing program of disbursement of tuition grants allegedly for the purpose of continued maintenance of segregated school systems. The payment of such tuition grants for one-half year did not abort the appeal or frustrate adjudication of the large issue. It was an unwarranted disbursement of public funds, but the Supervisors, themselves, are not now in possession of any part of those moneys. They are not officers of this court punishable under § 401(2) for official transgressions. What is attempted here is far from what was accomplished in Lamb

v. Cramer, and, to me, is inconsistent with an appropriate deference to an explicit congressional command of unquestioned constitutionality which limits our jurisdiction and authority.

I would not quibble with the majority's finding of fact that the conduct of the Supervisors was contemptible, but I do dissent from their conclusion that it was contemptuous and punishable as such, when the conclusion is dependent upon a reading of the statute which relegates it to meaninglessness. Such an unsympathetic construction is particularly inappropriate when the statute was clearly intended to inhibit our authority, has been declared by the Supreme Court to have that effect and has been uniformly construed by the courts of appeals in accordance with that evident intention. Such a statute limiting the jurisdiction of the federal courts is largely enforceable only by the limited courts, themselves. Above all other statutory commands, courts should be scrupulous to conform themselves to jurisdictional statutes, so that they do not appropriate to themselves powers which have been constitutionally withdrawn from them. If we exceed our authority, if we exercise powers we do not possess, the Supreme Court may correct us, but with the swelling

6. It was of little moment in any event, for clearly the court had the power to compel the attorney to restore the property which he had taken with notice not only of the pendency of the proceeding, but with notice as well of the specific liens held by the adverse parties.

7. Ex parte Robinson, 19 Wall. 505, 86 U.S. 505.

8. It may be that Lamb did not seek protection of the statute because of ignorance of it. More probably, he did not because he thought the court's authority sufficiently clear under § 401(2) to warrant his concentration of his defense in an attack upon the service of process. In either event, since, under the plain holdings of the relevant authorities at that time, the contempt proceeding was not arguably authorized by § 401(3), but probably was authorized by § 401(2), the Supreme Court's opinion, with no reference to either, cannot be construed as an authoritative construction of § 401

(3). There are too many reasonable explanations of the Supreme Court's action in that case to permit acceptance of the least likely and the most attenuated.

Twenty-four years after Lamb's case was decided, the Supreme Court held that an enrolled attorney was not an officer of the court within the meaning of § 401 (2), Cammer v. United States, 350 U.S. 399, 76 S.Ct. 456, 100 L.Ed. 474, but that was not the prevailing notion when Lamb sought to retain the fruits of his malfeasance. See e. g. Ex parte Bradley, 7 Wall. 364, 74 U.S. 364, 374, 19 L.Ed. 214; Tanner v. United States, 10 Cir., 62 F. 601; Ex parte Davis, C.C.Fla., 112 F. 139. If the explanation of Lamb's failure, and that of the courts which decided his case, to deal with the statute does not lie in an absence of awareness of it, speculation about the reason for ignoring it must be against a background of the law as it was understood at the time.

volume of demand upon that court, the congressional scheme can be effectively and promptly implemented only if the lower courts take great care to move only within the lawful boundaries of their authority.

Respectfully, I dissent from the conclusion that the Supervisors be held in contempt.