## CAMMER *v.* UNITED STATES.

No. 110.   Argued January 24, 1956.—Decided March 12, 1956.

*Charles E. Ford* argued the cause and filed a brief for petitioner.

*Gray Thoron* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Olney, Beatrice Rosenberg* and *Richard J. Blanchard.*

Mr. Justice Black delivered the opinion of the Court.

18 U. S. C. § 401 (2) empowers a court of the United States to punish as contempt "Misbehavior of any of its

officers in their official transactions . . . ." [1]    Petitioner,
a lawyer, sent a questionnaire to a District of Columbia
grand jury.   For this, the District Court found petitioner
guilty of contempt and fined him $100.   122 F. Supp.
388.   In so doing the court held that within the meaning
of the statute petitioner was one "of its officers" and
that sending the questionnaire was "misbehavior" in an
"official transaction."   The Court of Appeals affirmed,
Circuit Judge Fahy dissenting.   96 U. S. App. D. C. 30,
223 F. 2d 322.   The construction of the statute raised
such important questions that we granted certiorari.
350 U. S. 817.   A rather detailed statement of the facts,
which are not in dispute, will point up the broad scope
given the statute in sustaining this conviction.

A District of Columbia grand jury returned an indict-
ment against Ben Gold, charging him with having filed
a false non-Communist affidavit in violation of 18 U. S. C.
§ 1001.   Petitioner promptly appeared as his attorney.
Shortly thereafter the same grand jury summoned two of
Mr. Gold's associates, commanding them to appear and
produce documents.   Petitioner appeared for them and
moved to quash and vacate the subpoenas.   On the same
day or the next, petitioner mailed from New York identi-
cal letters and questionnaires to all members of the grand
jury who were employees of the Federal Government.   In
the letters petitioner told the grand jurors that as Mr.

---

[1] Section 401 in its entirety provides:

"A court of the United States shall have power to punish by fine or
imprisonment, at its discretion, such contempt of its authority, and
none other, as—

"(1) Misbehavior of any person in its presence or so near thereto
as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order,
rule, decree, or command."

Gold's attorney he was trying to learn the effect of the Government's loyalty program on federal employee jurors. Explaining that he wanted no information concerning proceedings or deliberations of the grand jury, he asked the jurors to answer his questions on the ground that it was their duty as citizens "to help enlighten the court on an issue which affects the liberty of a citizen on trial in a criminal case." All of the questions were directed toward learning whether the government employee jurors might be influenced by bias or fear to indict persons charged with having had some association with the Communist Party. On the basis of these facts, the District Court ordered petitioner to appear and show cause why he should not be adjudged guilty of contempt under 18 U. S. C. § 401 (2).

Petitioner appeared and answered the charges. He admitted the facts just stated but denied that his conduct constituted contempt within the meaning of the statute. His answer set out the following additional facts which are not disputed:

Prior to the return of the indictment against Mr. Gold in the District of Columbia, two federal grand juries in New York had investigated this same alleged offense but returned no indictment. Immediately after Mr. Gold was arraigned in the District of Columbia Court, petitioner learned from a roster of the grand jury obtained from the clerk that 13 members of the grand jury—a majority—were government employees. Petitioner decided to make a motion challenging the legal qualifications of the government employee jurors. He concluded that this could be done under Rule 6 (b) of the Federal Rules of Criminal Procedure, relying in part on this Court's statement in *Dennis* v. *United States,* 339 U. S. 162, 171–172, that "Preservation of the opportunity to

prove actual bias is a guarantee of a defendant's right to an impartial jury."

Petitioner was also led to believe that it would be necessary to obtain statements from the grand jurors because of the Government's brief and the court's holding in *Emspak* v. *United States,* 91 U. S. App. D. C. 378, 203 F. 2d 54. There the Government successfully contested Emspak's efforts to show that federal employee grand jurors were biased and should not have served by arguing that "there is not the slightest indication in the long motion and offer of proof that an attempt has been made to interview a single one of the persons." The Government also argued there that it was the defendant's duty to make his own investigation of bias instead of calling on the court to make it for him. The petitioner was also influenced by what had taken place in connection with an investigation of bias of government employees in another case in the District of Columbia. There a district judge had held that the defendant Weinberg was not entitled to a hearing as to bias of government employees as grand jurors unless the defendant had himself first undertaken to contact the jurors to ascertain from them the existence of bias. The district judge had stated that there was "nothing to prevent counsel, if he sees fit, contacting those 15 members [of the grand jury] and inquiring only of one subject, whether or not they had any personal bias toward" the defendant. After this statement counsel for Weinberg had sent a letter and questionnaire to all the government employee members of the grand jury. Petitioner consulted with Weinberg's lawyers who told him they had sent the letters and questionnaires without the prior knowledge or authority of the district judge, that their action was later made known to him, and that no suggestion of criticism was made either by the judge or by the Government. Petitioner then mailed substantially the

same letter and questionnaire sent by Weinberg's counsel to the government employees on the grand jury that had indicted his client, Gold.

On the basis of the foregoing undisputed facts the district judge found petitioner guilty of contempt. He concluded that petitioner's act in sending the questionnaires was an impropriety but went on to say: "There seems to be reason to believe respondent may have misconceived the proprieties. What he did was open. There was no opprobrious personal approach to jurors. There is indication respondent may have believed he had a right to propound the questions at the time he did, notwithstanding this Court is of opinion he had not." 122 F. Supp., at 389.

The contempt section here relied on derives from the Contempt Act of March 2, 1831. 4 Stat. 487. In *Nye* v. *United States,* 313 U. S. 33, we reviewed the history of the 1831 Act and found that its purpose was greatly to limit the contempt power of federal courts.[2] For this reason we gave the provision of the Contempt Act then under consideration a narrow construction. Even though we recognized that Nye was guilty of "highly reprehensible" conduct, we held that he could not be punished summarily for contempt but must be "afforded the normal safeguards surrounding criminal prosecutions." *Id.,* at 52, 53. Some time after the *Nye* case we considered *In re Michael,* 326 U. S. 224. There a trustee in bankruptcy had been adjudged guilty of contempt. The Gov-

---

[2] For a discussion of the 1831 Act and the narrow limits of the contempt power in general, see Frankfurter and Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers, 37 Harv. L. Rev. 1010; Nelles and King, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 525. See also Stansbury, Report of the Trial of James H. Peck (1833).

ernment argued that he was guilty of misbehavior as an officer of the court in an official transaction under the same section involved here. Again we pointed out that the 1831 Act "represented a deliberate Congressional purpose drastically to curtail the range of conduct which courts could punish as contempt." We there construed the Act as embodying a congressional plan to limit the contempt power to *"the least possible power adequate to the end proposed."* See *Anderson* v. *Dunn,* 6 Wheat. 204, 231. We added, "The exercise by federal courts of any broader contempt power than this would permit too great inroads on the procedural safeguards of the Bill of Rights, since contempts are summary in their nature, and leave determination of guilt to a judge rather than a jury. It is in this Constitutional setting that we must resolve the issues here raised." 326 U. S., at 227. We consider the judicial power here in that same setting. Cf. *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 15–16.

Petitioner contends that his conduct was not "misbehavior" within the meaning of the Act, but was a good faith attempt to discharge his duties as counsel for a defendant in a criminal case. We find it unnecessary to decide this but it is not out of place to say that no statute or rule of court specifically prohibits conduct such as petitioner's. Petitioner also contends that sending the questionnaire was not an "official transaction" within the meaning of the Act. However, if we assumed that a lawyer in ordinary practice is an "official" or "officer" of the court it would be hard to draw any line between "official" and "unofficial" transactions. Indeed there is plausibility in the implication of the Court of Appeals that if lawyers are covered by this section of the Act they are engaged in official transactions whenever engaged in the "practice of the profession." But we find it unnecessary to decide when a lawyer is engaged in an "official

transaction" for we hold that a lawyer is not a court "officer" within the meaning of § 401 (2).

It has been stated many times that lawyers are "officers of the court." One of the most frequently repeated statements to this effect appears in *Ex parte Garland,* 4 Wall. 333, 378. The Court pointed out there, however, that an attorney was not an "officer" within the ordinary meaning of that term. Certainly nothing that was said in *Ex parte Garland* or in any other case decided by this Court places attorneys in the same category as marshals, bailiffs, court clerks or judges. Unlike these officials a lawyer is engaged in a private profession, important though it be to our system of justice. In general he makes his own decisions, follows his own best judgment, collects his own fees and runs his own business. The word "officer" as it has always been applied to lawyers conveys quite a different meaning from the word "officer" as applied to people serving as officers within the conventional meaning of that term.[3] Cf. *Labor Board* v. *Coca-Cola Bottling Co.,* 350 U. S. 264. We see no reason why the category of "officers" subject to summary jurisdiction of a court under § 401 (2) should be expanded beyond the group of persons who serve as conventional court officers and are regularly treated as such in the laws. See 28 U. S. C. §§ 601–963.

There are strong reasons why attorneys should not be considered "officers" under § 401 (2). As we pointed out in the *Nye* case, the 1831 Act was promptly passed by the Congress after the impeachment proceedings against

---

[3] Illustrations of the confusion and difficulty of courts in explaining what is meant when a lawyer is called an officer of the court may be found in the following cases: *Langen* v. *Borkowski,* 188 Wis. 277, 301, 206 N. W. 181, 190; *In re Galusha,* 184 Cal. 697, 698, 195 P. 406; *Sowers* v. *Wells,* 150 Kan. 630, 635, 95 P. 2d 281, 284–285; *Bergeron, Petitioner,* 220 Mass. 472, 476, 107 N. E. 1007, 1008.

Judge Peck failed by a senatorial vote of 22 to 21. Judge Peck had sent a lawyer to jail and had taken away his right to practice as punishment for an alleged contempt. The contempt consisted of published criticism of Judge Peck's opinion in a case in which the convicted lawyer had appeared as counsel; he was also counsel in other pending cases involving similar issues. Those directing the impeachment proceedings, who later brought about the passage of the 1831 Act, expressed deep concern lest lawyers continue to be subjected to summary trials by judges without the safeguards of juries and regular court procedure. Congressman James Buchanan who made the last argument against Judge Peck stated:

> "But what is the process in the case of contempts? Without either an information or an indictment, but merely on a simple rule to show cause, drawn up in any form the judge may think proper, a man is put upon his trial for an infamous offence, involving in its punishment the loss both of liberty and property. He is deprived both of petit jury and grand jury, and is tried by an angry adversary prepared to sacrifice him and his rights on the altar of his own vengeance.

> . . . . .

> "I may be wrong, but I hold it to be the imperative duty of an attorney to protect the interests of his client out of court as well as in court."[4]

Again Mr. Buchanan said:

> "I believe that I have as good a right to the exercise of my profession, as the mechanic has to follow his

---

[4] Stansbury, Report of the Trial of James H. Peck (1833), 445, 455.

trade, or the merchant to engage in the pursuits of commerce. . . . The public have almost as deep an interest in the independence of the bar as of the bench." [5]

Such statements by the same man who reported the 1831 Act to the House of Representatives almost immediately after Judge Peck's acquittal are completely inconsistent with a purpose to treat lawyers as "officers of the court" subject to summary punishment. We cannot hold that lawyers are subject to the precise kind of summary contempt power that the Act was designedly drawn to bar judges from exercising. Section 2 of that Act made ample provision for punishing corrupt efforts to influence, intimidate or impede juries.[6] And Congress expressly provided that prosecution therefor be by indictment. Substantially the same provision has been a part of our law ever since. 18 U. S. C. § 1503. See also Fed. Rules Crim. Proc. 7 (a). Of course it does not cover this case because there is no charge that petitioner attempted improperly to influence the jury or violate § 1503 in any other way. Had there been such a charge petitioner would have been entitled to a trial by jury after indictment by grand jury. We hold that a lawyer is not the

---

[5] *Id.*, at 450.

[6] *"And be it further enacted,* That if any person or persons shall, corruptly, or by threats or force, endeavour to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor, by indictment, and shall, on conviction thereof, be punished, by fine not exceeding five hundred dollars, or by imprisonment, not exceeding three months, or both, according to the nature and aggravation of the offence." 4 Stat. 488.

kind of "officer" who can be summarily tried for contempt under 18 U. S. C. § 401 (2).[7]   The judgment of the Court of Appeals must therefore be reversed.

*Reversed.*

MR. JUSTICE REED concurs in the judgment solely on the ground that the circumstances leading to the enactment of this statute dictate the Court's otherwise unique reading of the term "officers of the court."

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

---

[7] *Ex parte Bradley,* 7 Wall. 364, requires no different result.   The Court there held that an attorney could not be disbarred solely on a showing of a contempt committed before another court.   The Court did use broad language there as to the power of courts to punish attorneys as officers of courts for misbehavior in the practice of the profession.   The statements in *Ex parte Bradley* went so far as to say that lawyers became subject to the summary jurisdiction of courts "for the commission of any other act of official or personal dishonesty and oppression."   *Id.,* at 374.   However questionable those statements may be, they were not made, as the Court pointed out, with respect to a court's power to punish contempts.   The Court was referring to the generally exercised powers of courts in that day to discipline attorneys.   As said by the Court later in *Ex parte Robinson,* 19 Wall. 505, 512, "The power to disbar an attorney proceeds upon very different grounds" from those which support a court's power to punish for contempt.