**In re Darwin Charles BROWN, Appellant.**

**No. 23037.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1970.

Decided Nov. 2, 1971.

Mr. Thomas S. Jackson, Washington, D. C., with whom Mr. James P. Schaller, Washington, D. C., was on the brief, for appellant.

Mr. Edgar T. Bellinger, Washington, D. C. (appointed by the District Court under Rule 42(b) of the Federal Rules of Criminal Procedure), for appellee.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

**SPOTTSWOOD W. ROBINSON, III,**
Circuit Judge:

This case traces its origin to an unfortunate episode to which this court unknowingly made a substantial contribution and for which it must bear its full share of the blame. Under review is an attorney's conviction of criminal contempt emanating from his representation in the District Court of an indigent client on a motion seeking the latter's release from custody pending an appeal. Because the attorney was not a member of the bar of the District Court, he was cited for and found guilty of contempt of that court, and was sentenced to a term in jail. Our part in the affair was the appointment, through clerical error, of the attorney to represent the client on the appeal. After pondering deeply on the record and the relevant authorities, we find that the contempt conviction cannot stand. Accordingly, for the reasons discussed herein, we reverse.

## I

In August, 1967, the clerk of this court sent a form letter to practicing attorneys in the District of Columbia inquiring as to their availability to represent indigents on appeal. A follow-up letter was sent in April, 1968, to attorneys who had not previously responded. One such letter reached appellant,[1] who held membership in the bars of several courts,[2] though not locally, and who maintained an office in the District. In a reply letter, appellant expressed his willingness to serve, but pointed out that he was not a member of the bar of this court, and so would have to be specially admitted in order to accept an appointment.

Upon arrival of appellant's response in the clerk's office, a symbol was placed on it to indicate that appellant was not a member of our bar. Because of an employee's error, however, that information was not transferred to the card-file roster maintained by the clerk. As a result, an order was later issued appointing appellant as counsel for an indigent in a criminal appeal. Transmitted with the order was a checklist of suggestions and instructions, prepared by the Legal Aid Committee of the Bar Association of the District of Columbia, which we customarily send out as a convenience to appointed attorneys. The checklist called the attorney's attention to the possibility of securing the client's freedom during the review process, and included information as to how such an effort might be made.[3]

Shortly thereafter, appellant filed and argued in the District Court a motion for his client's release pending the appeal. When that motion was denied, appellant filed a motion for reconsideration, which likewise failed. Each motion was signed by appellant as "Counsel for Appellant Appointed by United States Court of Appeals for the District of Columbia Circuit." At no time did appellant make any other representation as to his pur-

---

1. It seems that the clerk's first communication—of August, 1967—was never received by appellant.

2. Appellant was a member of the bars of the Supreme Court of the United States, the United States Court of Appeals for the Ninth Circuit, the United States District Court for the Northern District of California, the United States Court of Military Appeals, and others.

3. The checklist directed attention to the provisions of the Bail Reform Act of 1966, 18 U.S.C. § 3146 et seq. (Supp. II, 1965–66), and admonished that counsel "may be able to obtain the release of appellant on personal recognizance or unsecured appearance bond. If he fails to qualify for such relief, you may be able to obtain a release on certain conditions or bail bond or limited custody." It referred to the requirement of Fed.R. App.P. 9(b) that motions for release pending appeal be presented to and disposed of by trial judges prior to consideration by courts of appeals. It continued:

Check the District Court file or inquire of trial counsel and determine whether an application for release pending appeal has been made in the District Court and, if so, with what results. If no such motion has been made, and release pending appeal is desired, it will be necessary for you to file and argue a motion in the District Court.

ported authority to appear in the District Court.

While a subsequently-filed application seeking the release was pending in this court, the error in appointing appellant was discovered, and the order of appointment was immediately vacated.[4] Two months later, the District Judge who had disposed of the bail motions appointed, *sua sponte,* an attorney to apply for an order to show cause why appellant should not be held in contempt of court.[5] The application was made, the show cause order was issued, and the matter proceeded to hearing. As we have indicated, appellant was found guilty of contempt and was sentenced to serve 45 days in jail. This appeal followed, with the District Judge's selectee as appellee.

Appellant submits three grounds for reversal of the conviction: (a) that by virtue of his appointment by this court, he was authorized to prosecute his client's release application in the District Court; (b) that the contempt charge should have been heard by a judge other than the one before whom he had appeared for that purpose; and (c) that the kind of intent prerequisite to guilt of criminal contempt was not proven beyond a reasonable doubt. Alternatively, appellant argues that the sentence was excessive and should be reduced. We think that, beyond the contention as to criminal intent, there are grave questions as to whether in other respects appellant's conduct amounted substantively to criminal contempt. We find it unnecessary to consider appellant's first

two points, or that with regard to the sentence. We treat the other two points in subsequent sections of this opinion.

## II

Our Constitution imposes on criminal processes well known limitations which do not obtain in other legal systems. It is not surprising, then, that the Federal Legislature would act responsively to demarcate the general scope of federal criminal contempt. In 1789, in the very first Judiciary Act, Congress gave the federal courts unbounded power to punish for criminal contempt,[6] but in 1831, still early in the Nation's history, circumscribed its exercise,[7] and as so restricted it remains today. The current authorizing statute [8]

> is based on [the] Act passed in 1831 in order to correct serious abuses of the summary contempt power that had grown up and was intended as a "drastic delimitation . . . of the broad undefined power of the inferior federal courts under the Act of 1789," revealing "a Congressional intent to safeguard Constitutional procedures by limiting courts, as Congress is limited in contempt cases, to 'the least possible power adequate to the end proposed.' " [9]

For " '[t]he exercise by federal courts of any broader contempt power than this . . . would permit too great inroads on the procedural safeguards of the Bill of Rights, since contempts are summary in their nature, and leave determination of guilt to a judge rather than a jury.' " [10]

---

4. In appellant's stead we appointed his law partner, who was a member of our bar. The latter, however, because of the shortness of time and his unfamiliarity with the case, moved in open court that appellant himself be permitted to argue the motion before us. We granted that request and appellant presented the argument.

5. Pursuant to Fed.R.Crim.P. 42(b).

6. 1 Stat. 73, 83 (1789). See Green v. United States, 356 U.S. 165, 169, 78 S. Ct. 632, 21 L.Ed.2d 672 (1958).

7. 4 Stat. 487 (1831).

8. 18 U.S.C. § 401 (1964), quoted in text *infra* following note 11.

9. In re McConnell, 370 U.S. 230, 233–234, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962), quoting In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30 (1945) (footnotes omitted). See also In re Michael, *supra;* Nye v. United States, 313 U.S. 33, 45–48, 61 S.Ct. 810, 85 L.Ed. 1172 (1941).

10. In re McConnell, *supra* note 9, 370 U.S. at 234, 82 S.Ct. at 1291, quoting In re Michael, *supra* note 9, 326 U.S. at 227, 66 S.Ct. at 79–80 (footnote omitted).

■ Our starting point, then, is the general criminal contempt statute, 18 U.S.C. § 401.[11] It provides:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

And it is from within the four corners of this provision that we must draw the substance of the offense for which appellant has been convicted.[12]

■ Nowhere does the record undertake to specify which of the three subdivisions of Section 401 was sought to be implemented in this case. Neither the order to show cause nor the application therefor makes a specific reference. The District Judge stated that "[t]he question is whether [appellant] has wilfully been contemptuous in the presence of the Court. That is the language of the statute;" this would seem to invoke the first subdivision, as the argument at the hearing suggested. Appellee's brief mentions both the first and third sub-

divisions; appellant does not distinguish among them, presumably because his defense rested in large part on an alleged failure of the evidence to show contumacious intent, a prerequisite under all three subdivisions.[13]

■ In this state of affairs, we test appellant's conviction by all three subdivisions. One need not detain us long. It is clear that the second subdivision does not cover the situation at bar for, as the Supreme Court has held, an attorney is not an officer of the court within the meaning of its provision.[14] We must look, then, to subdivisions 1 and 3 for a basis for the conviction.

### III

The design of the first subdivision of Section 401 is manifest. Its obvious purpose is to prevent obstructions of the administration of justice; by its terms, the misconduct alleged to be contemptuous must achieve such character "as to obstruct the administration of justice." [15] As in Ex parte Hudgings [16] the Supreme Court declared:

An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest. This being true, it follows that the presence of that element must clearly be shown in every case where

---

11. 18 U.S.C. § 402, codified as a companion provision, has no application to this case. It operates only where a "lawful writ, process, order, rule, decree, or command" of a federal or District of Columbia court is wilfully disobeyed by an act which is "of such character as to constitute also a criminal offense under [a] statute of the United States or under the laws of [a] State in which the act was committed." Assuming even that appellant's unlicensed appearance in the District Court infringed a "rule" or "command" of the court within the meaning of this section, see text *infra* at note 33, we have found no statute constituting it an independent criminal offense.

12. Section 401 itself imposes that limitation by extending the contempt power to

misconduct of the types defined in its three subdivisions "and none other."

13. While criminal intent is an essential element under each of the three subdivisions, we find it necessary to explore the evidence thereon only in connection with the third. See Part IV, *infra*. That is because for other reasons neither the first nor second subdivisions can be applied to this case. See text *infra* at note 14 and Part III, *infra*.

14. Cammer v. United States, 350 U.S. 399, 404–408, 76 S.Ct. 456, 100 L.Ed. 474 (1956).

15. Text *supra* following note 11.

16. 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919).

the power to punish for contempt is exerted. . . .[17]

In that case, a trial judge held a witness in criminal contempt for giving what in the judge's view was perjured testimony. The Court held that to avoid the procedural safeguards of a full-dress trial and convict the witness of contempt rather than perjury, "there must be added to the essential elements of perjury . . . the further element of obstruction to the court in the performance of its duty."[18] Commitment of the witness was held void for excess of power because "the punishment was imposed for the supposed perjury alone without reference to any circumstance or condition giving it an obstructive effect."[19]

The application of *Hudgings* to cases arising under Section 401(1) was confirmed by In re McConnell,[20] which also resulted in reversal of a contempt conviction. There, a lawyer had been ordered to refrain from a certain line of questioning to witnesses, to which the lawyer replied that he would not "unless some bailiff stops us." At this point a recess was called, and the lawyer never returned to the forbidden questions, so his threat was never fulfilled. The Supreme Court, relying on *Hudgings*, emphasized that it must "clearly be shown" that "an actual obstruction of justice" occurred.[21] Since the attorney did not resume the forbidden line of questioning, the Court concluded that no such interference had been shown.

In the case before us, there was likewise no showing of an actual obstruction of the administration of justice. Appellant's appearance in the District Court as counsel on the motions seeking release did not disrupt judicial proceedings, cause expense or produce delay.[22] On the contrary, his activities moved the matter of release pending appeal along. We accepted his efforts as a compliance with the requirement that applications of that kind first be presented in the trial court,[23] and as thus paving the way for consideration of the application anew in this court immediately. Appellee contends, however, that the administration of justice may have been obstructed because appellant's client might later raise an issue of ineffective assistance of counsel and upset his conviction, which we affirmed on appeal. But the record before us contains neither a finding nor evidence that appellant's representation on the motions for release was constitutionally inadequate merely because he was not a member of the local bar, and we would in any event have difficulty with any such proposition as a generality.

██ Appellant, as we have said, had qualified for practice in other courts of high standing.[24] Participation in litigation—even criminal litigation—by non-members of the local bar simply by obtaining leave of court is a common event in this and other courts. We have never felt that as a class these appearances are per se ineffective or obstructive; indeed, as we have pointed out, we permitted appellant to argue the application to this

---

17. *Id.* at 383, 39 S.Ct. at 339.

18. *Id.*

19. *Id.* at 384, 39 S.Ct. at 340.

20. *Supra* note. 9.

21. 370 U.S. at 234, 82 S.Ct. at 1291.

22. Compare *In re McConnell* and *In re Michael*, discussed in text *supra* at notes 16–21.

23. See Fed.R.App.P. 9(b).

24. See note 2, *supra*. We distinguish, of course, cases wherein a disbarred attorney undertakes legal representation. *E. g.,*

In re Fletcher, 71 App.D.C. 108, 107 F.2d 666, cert. denied, 308 U.S. 510, 60 S.Ct. 119, 84 L.Ed. 435 (1939) ; Bowles v. Laws, 59 App.D.C. 399, 45 F.2d 669 (1930). In such cases the attorney acts in defiance of the order of disbarment, and so the contempt authority conferred by subdivision (3) of § 401 becomes exercisable irrespective of any consequent obstruction of the administration of justice. See Part IV, *infra.* See also Green v. United States, *supra* note 6, 356 U.S. at 168–172, 78 S.Ct. 632, 2 L.Ed.2d 672.

court for release.[25] Quite recently it was held that representation of a federal defendant by an attorney not a member of the federal bar did not of itself amount to ineffective assistance.[26] Moreover, since appellant did not represent the client at trial, or on any aspect of the appeal other than the motion for release, we fail to see how the representation could be collaterally attacked to produce a reversal of the conviction. And since both the application for release and the appeal were disposed of long ago, the calibre of the representation on that application is completely moot.

The issue presented to us apparently has not previously arisen in the federal system. We realize that lawyers appearing without local bar membership and without leave of court have been held in contempt by some state courts. In those instances, however, the courts have proceeded upon the basis of a specific authorizing statute,[27] a broader contempt statute than we have here,[28] or a more expansive view of judicial power to

punish contempts as crimes than prevails in the federal courts.[29] Those cases cannot be accepted as guideposts for the decision to be made here.

Thus we are brought back to the conclusion earlier expressed. Absent any evidence to warrant a finding of an actual obstruction of the administration of justice, there can be no violation of the first subdivision of Section 401. We think it clear that actual, not theoretical, obstruction is the test, and that any claimed obstruction must be proven precisely.[30] Here, while appellant may have engaged in the unauthorized practice of law, there has been no showing that any such obstruction actually occurred. Appellant's conviction, therefore, cannot be sustained under subdivision 1.

## IV

The only remaining statutory basis upon which appellant's conviction could possibly be sustained is the third subdivision of Section 401. That subdivision authorizes federal courts to punish as a criminal contempt any "[d]isobedience

25. See note 4, *supra.*

26. Farr v. United States, 314 F.Supp. 1125, 1132 (W.D.Mo.1970), aff'd, 436 F.2d 975 (8th Cir.), cert. denied, 402 U.S. 947, 91 S.Ct. 1639, 29 L.Ed.2d 116 (1971). The authorities appellee cites for the argument that appellant's representation was a violation of his client's Sixth Amendment rights do not support that proposition. Like our own decision in Harrison v. United States, 123 U.S.App.D.C. 230, 359 F.2d 214 (1965), they all involved laymen posing as lawyers. In the two state cases cited by appellee, the argument of ineffective assistance of counsel was decided on the particular facts involved. Higgins v. Parker, 354 Mo. 888, 191 S.W.2d 668, cert. denied, 327 U.S. 801, 66 S.Ct. 902, 90 L.Ed. 1026 (1946); People v. Cox, 12 Ill.2d 265, 146 N.E.2d 19, 22–23 (1957).

27. *E. g.,* In re Matthews, 57 Idaho 75, 62 P.2d 578, 111 A.L.R. 13 (1936); In re Bailey, 50 Mont. 365, 146 P. 1101 (1915).

28. *E. g.,* State ex rel. Oregon State Bar v. Lenske, 243 Or. 484, 407 P.2d 250, 253–254 (1965), cert. denied, 384 U.S. 1028, 86 S.Ct. 1920, 16 L.Ed.2d 1047 (1966).

29. *E. g.,* Bessemer Bar Ass'n v. Fitzpatrick, 239 Ala. 663, 196 So. 733, 735–737 (1940); Rhode Island Bar Ass'n v. Automobile Serv. Ass'n, 55 R.I. 122, 179 A. 139, 141, 100 A.L.R. 226 (1935); In re Morse, 98 Vt. 85, 126 A. 550, 552, 36 A.L.R. 527 (1924). But see Murphy v. Townley, 67 N.D. 560, 274 N.W. 857, 860–862 (1937). For the opposing federal law, see Part II, *supra.* And see Heiskell v. Mozie, 65 App.D.C. 255, 82 F.2d 861 (1936), sustaining the contempt conviction in the Municipal Court of the District of Columbia of a lay real estate agent for prosecuting on behalf of the landlord-principal a dispossession action in violation of the court's rules. Section 401 was not involved since that court was not "[a] court of the United States" and, as the opinion observes, "[n]o point is made of the power of the municipal court to punish for contempt committed in its presence." *Id.* at 257, 82 F.2d at 863.

30. See text *supra* at notes 15–21. See also In re McClure, 143 U.S.App.D.C. 114, 442 F.2d 836 (1971); United States v. Sopher, 347 F.2d 415 (7th Cir. 1965).

or resistance to its lawful writ, process, order, rule, decree, or command." [31] At the time appellant appeared in the District Court, its Rule 96 specified that "[n]o person who is not a member of the Bar of" that court "shall engage in the general practice of law in the District of Columbia." [32] The only theory on which subdivision 3 would underpin the conviction is that it was activated by a violation of Rule 96.

That theory, however, like the others discussed herein, encounters difficulties. There arises, at the outset, the question whether a noncompliance with Rule 96 is a disobedience of a "rule" within the meaning of subdivision 3. Since every other directive which the subdivision speaks of—"writ, process, order, . . decree, or command"—is one which is specifically addressed to a particular person or group and one which traditionally has been enforceable through the contempt power, it may be that the "rule" to which subdivision 3 refers is the rule in the process sense—the rule to show cause, the rule nisi, and the like—rather than a general, standing rule of court, which usually draws its sanctions from other sources. [33] We do not pause, however, to consider the question for there is an even more serious obstacle to applying subdivision 3 in the circumstances here.

■ The foundation for the criminal contempt power is the need to protect the judicial process from wilful impositions, particularly those designed to hobble the normal machinery of justice. [34] Where there is no wrongful intent, the remedial qualities of civil contempt would generally appear to be not only the most relevant but also to be fully adequate. That would seem all the more so in the setting of a long standing congressional will to restrict the federal courts to "the least possible [criminal contempt] power adequate to the end proposed." [35] To reserve exercise of that power to conduct acutely demanding it is but to adhere to the policy and spirit underlying the legislative grant. [36]

■ Not surprisingly, then, one finds that a degree of intentional wrongdoing is an ingredient of the offense of criminal contempt. [37] Only recently we

31. See text *supra* following note 11.

32. Rule 96 read:

No person who is not a member of the Bar of the United States District Court for the District of Columbia shall engage in the general practice of law in the District of Columbia, or shall represent or hold himself or herself out directly or indirectly as being entitled or authorized to engage in the general practice of law in the District of Columbia. This rule shall not apply to practice before other federal courts or executive departments, government boards, commissions, or agencies, or to the holding out of the right to practice before such other federal courts or executive departments or government boards, commissions, or agencies.

Rule 96 was superseded on March 11, 1969, by present Rule 93(j), which is of the same general purport with some change of the earlier exemption with respect to attorneys maintaining law offices or regular connections with established law offices in the District.

33. The present phraseology is derived from the 1831 Act, 4 Stat. 487 (1831). The legislative history is totally unilluminating. Compare, however, the language of 18 U.S.C. § 402 (1964) ("rule . . . entered in any suit or action brought . . . by the United States"). Use of the criminal contempt power to vindicate violations of court rules of practice arguably would expand that power beyond congressional contemplation and in given cases would produce monstrous results. It has, however, been held that a television news photographer's contempt conviction for disobedience of what was denominated a standing court order against the taking of photographs in the courthouse building could be rested on subdivision 3. Seymour v. United States, 373 F.2d 629 (5th Cir. 1967).

34. See the cases cited *infra* notes 38–40.

35. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821). See also Part II, *supra.*

36. Compare Nye v. United States, *supra* note 9, 313 U.S. at 51–52, 61 S.Ct. 810, 85 L.Ed. 1172.

37. See the cases cited *infra* notes 38–40, 42.

pointed out that "[a]n essential element of that offense is an intent, either specific or general, to commit it. . . . By definition, contempt is a *'wilful* disregard or disobedience of a public authority.' "[38] Knowledge that one's act is wrongful and a purpose to nevertheless do the act are prerequisites to criminal contempt, as to most other crimes.[39] Good faith pursuit of a plausible though mistaken alternative is antithetical to contumacious intent,[40] however unimportant it may be in the context of civil contempt.[41] And proof beyond a reasonable doubt that the alleged contemnor possessed the required intent must forerun a criminal contempt conviction.[42] We look, then, to the record before us to determine whether these conditions were met.

Appellant was appointed by an order of this court to represent an indigent litigant. Though issued by mistake, our order was impeccable on its face and the appointment was unequivocal. We simultaneously passed along to appellant the Bar Association checklist of suggestions and instructions from which he could see that, if in his professional judgment grounds for release pending appeal existed, such relief was to be initially sought in the District Court.[43] The significance of these events must,

of course, be gauged in the context of appellant's previous acknowledgment to this court that he was not a member of its bar and could serve on appointment only by special leave.

So it was that appellant appeared in the District Court on behalf of the client for whom he had been appointed. In doing so, he made it clear that he was there as counsel by virtue of that appointment,[44] and there is not the slightest indication that he ever represented an entitlement to be there in any other capacity. The theory, here as well as in the District Court, that this amounted to a contempt of that court is that appellant made the appearance with knowledge that he had no right to do so. We may assume, without deciding that our appointment of appellant as counsel on appeal did not authorize him to handle incidental motions in the District Court, but not even a lack of actual authority would end the matter. There would remain the crucial question whether the unauthorized appearance was accompanied by a contumacious intent,[45] and we deem the record insufficient on that score to support a contempt conviction.

We first note that there was no express finding of contumacious intent; the only finding as to appellant's state of mind was that his action was wilful,[46]

---

38. Sykes v. United States, 144 U.S.App. D.C. 53, 55, 444 F.2d 928, 930 (1971).

39. United States v. UMW, 330 U.S. 258, 303, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947); United States v. Jackson, 426 F.2d 305, 308–309 (5th Cir. 1970); In re Marshall, 423 F.2d 1130, 1131–1132 (5th Cir. 1970); United States v. Sopher, *supra* note 30, 347 F.2d at 418; In re D. I. Operating Co., 240 F.Supp. 672, 676 (D.Nev.1965). See also Wilson v. North Carolina, 169 U.S. 586, 600, 18 S.Ct. 435, 42 L.Ed. 865 (1898); Offutt v. United States, 98 U.S.App.D.C. 69, 72, 232 F.2d 69, 72, cert. denied, 351 U.S. 988, 76 S.Ct. 1049, 100 L.Ed. 786 (1956).

40. See Nilva v. United States, 352 U.S. 385, 395, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957); United States ex rel. Shell Oil Co. v. Barco Corp., 430 F.2d 998, 1002 (8th Cir. 1970).

41. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

42. Stringfellow v. Haines, 309 F.2d 910, 912 (2d Cir. 1962); United States v. Jackson, *supra* note 39, 426 F.2d at 309, citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Cliett v. Hammonds, 305 F.2d 565, 569–570 (5th Cir. 1962); In re Floersheim, 316 F.2d 423, 428 (9th Cir. 1963); Yates v. United States, 316 F.2d 718, 725 (10th Cir. 1963).

43. See note 3, *supra.*

44. See text *supra* following note 3.

45. See text *supra* at notes 37–40, 42.

46. The findings in toto are:
   The Court finds that Mr. Brown is not a member of the Bar of this Court, he was not admitted pro hac vice, or

and we cannot be sure that the District Judge equated the two.[47] The more fundamental question, however, is whether the evidence adduced at the contempt hearing could sustain a finding beyond a reasonable doubt that appellant entertained a contumacious intent. We believe that it does not.

Surely the events we have recited would not have that effect. So far as they reflect anything in regard to appellant's state of mind, they are as consistent with an abiding though perhaps misplaced confidence in our appointment as with a contemptuous disregard of the District Court's Rule 96. That conclusion, we think, is fortified by the consideration that when laid side-by-side with the order of appointment read in conjunction with the Criminal Justice Act of 1964,[48] the meaning of Rule 96 is not fully precise.[49] An inferred fact must find its nexus with a proven fact,[50] and a conviction of crime cannot rest on evidence that no more supports guilt than innocence.[51]

Nor have we been referred to any other events of record [52] which in our view

otherwise, under the rules of this Court to argue a motion before the Court in the case of Daniel Porter; that he argued a motion to this Court and in the Court's presence on November 1, 1968; that his action was wilful.

The Court enters a verdict of guilty beyond a reasonable doubt for this act of criminal contempt.

In dealing with the question of his wilfulness, the Court has considered the standards that we apply in all criminal cases with juries.

47. During oral argument, the judge gave a clue as to his definition of wilfulness. He said:

It is a question, I think, not of whether he has been personally obnoxious, or anything of that kind, which you are suggesting. The question is whether he has wilfully been contemptuous in the presence of the Court. That is the language of the statute. When a person appears in Court, knowing that he is not admitted, and argues a motion, he is in the presence of the Court and he is unauthorized to be there and his appearance is wilful.

48. 78 Stat. 552 (1964), 18 U.S.C. § 3006A (1964). The relevance of the Act is that it contains no requirement that counsel appointed for an indigent have membership in the local bar.

49. The construction of Rule 96 presents difficulties in the circumstances of this case because in terms it is pitched to "the general practice of law in the District," see note 32, *supra*, and thus arguably does not apply in the area of a special appointment such as appellant received. This is reinforced by the separate provision in District Court Rule 4 allowing, as an exception to the formal rigors of admission, an attorney to file pleadings and papers even though he has no office in the District. Uncertainty also arises from the fact that appellant responded to suggestions from this court, which he took as his commission to appear in the District Court in a special capacity. In this light, our instructions to appellant, as counsel we appointed, may have beclouded the applicability of the District Court rules to him.

It seems worth noting, too, that "before one may be punished for contempt for violating a court order, the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed." McFarland v. United States, 295 F. 648, 650 (7th Cir. 1933). See NLRB v. Deena Artware, Inc., 261 F.2d 503, 510 (6th Cir. 1958) (order "not sufficiently definite") and citations therein. It would seem to follow that a standing court rule, no less than a court order, must meet this requirement before its alleged violation could summon an exercise of the criminal contempt power.

50. See United States v. Johnson, 140 U.S. App.D.C. 54, 62–63, 433 F.2d 1160, 1168–1169 (1970).

51. Carter v. United States, 102 U.S.App. D.C. 227, 231–232, 252 F.2d 608, 612–613 (1957), and cases cited in note 4 therein.

52. Appellee points to a conviction appellant had previously suffered, see Brown v. United States, No. 19,460 (D.C.Cir. Dec. 2, 1966), cert. denied, 389 U.S. 977, 88 S.Ct. 457, 19 L.Ed.2d 472 (1967), as a circumstance that might have influenced his action since any formal application for admission would probably have brought it to light. The conviction was not, however, put into evidence, and the record does not show that the judge took judicial notice of it. We must accordingly disregard it. Appellee has also

could supply an inference beyond a reasonable doubt that the required intent was present. Appellee relies, as apparently the District Court did, upon a stipulation at the contempt hearing that appellant knew that he lacked authority to appear in the District Court otherwise than as our order of appointment may have conferred it, but this stipulation adds little or nothing. The essential question throughout this litigation has been the significance, in total context, which appellant gave the appointment order. The stipulation does not tend to negate a good faith belief that the order armed him with incidental authority to move for his client's release in the District Court. And whatever could be said as to what a more careful approach by appellant would have accomplished, we cannot say that his failure to probe more deeply his authority to enter the District Court makes for the kind of intent that is essential to a conviction of criminal contempt.[53]

■■■■ We have recently voiced our agreement "that a lawyer must be held to a high standard of accountability and that he may not deliberately or recklessly flout the authority and dignity of the court,"[54] and that "if he does so he should be subject to disciplinary action."[55] The District Court has authority, of course, to maintain its freedom from unauthorized practice of the law, and nothing herein is to be taken as an indication to the contrary. The sole issue presented on this appeal is whether, on the evidentiary showing made at the hearing, the contempt power could here be exercised for that purpose. We hold that it could not.

The judgment appealed from is reversed, and the case is remanded to the District Court with directions to discharge the order to show cause.

Reversed.

TAMM, Circuit Judge (dissenting):

Appraisal of conduct alleged to constitute criminal contempt of court is always difficult because of the dearth of judicial definition of the elements constituting the prohibited conduct. The District Judge in our present case acted in initiating these contempt proceedings under the authority of Rule 42(b) of the Federal Rules of Criminal Procedure, but that rule is authoritative and procedural rather than definitive of prohibited conduct. The statutory definition of contempt in the federal courts appears in Title 18 of the United States Code, section 401.[1] This provision serves basically as a limitation upon the area in which a judge may punish for contempt of his authority. Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958), adequately recounts the historical perspective of this statute and makes understandable the trepidation widely held regarding the danger of continuing too broad an authority arbitrarily to punish summarily for contempt in the hands of judges.

In general terms, then, criminal contempt consists of the doing of acts which

---

alluded several times to the fact that appellant did not testify at the contempt hearing. Since the contempt proceeding was criminal in nature, no inference from that occurrence can be tolerated. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

53. "The requisite intent may of course be inferred if a lawyer's conduct discloses a reckless disregard for his professional duty." Sykes v. United States, *supra* note 38, 144 U.S.App.D.C. at 55, 444 F. 2d at 930. The evidence does not reach that level here.

54. *Id.* at 55, 444 F.2d at 930.

55. *Id.* at 55, 444 F.2d at 930.

1. 18 U.S.C. § 401 (1964):
   A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
   (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
   (2) Misbehavior of any of its officers in their official transactions;
   (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

evidence disrespect of the court, its processes or its rules and which "obstruct the administration of justice, or tend to bring the court into disrespect." Black's Law Dictionary 390 (4th ed. 1957). It embraces conduct which is prosecuted "to preserve the power and vindicate the dignity of the courts, and to punish for disobedience of their orders"; the power "punitive in [its] nature, and the government, the courts, and the people are interested in [its] prosecution." In re Nevitt, 117 F. 448, 458 (8th Cir. 1902). "A criminal contempt involves no element of personal injury. It is directed against the power and dignity of the court, and private parties have little if any interest in the proceedings for its punishment." (*Id.* at 459.)

The fear that the frightening historic power to punish for contempt will be abused has, as indicated heretofore, resulted in Congressional restraint upon the exercise of this authority, since section 401 of Title 18 confines the power to punish to the three enumerated factual situations "and none other." As a result judges must limit their punitive action to that permitted by Congress; but in exercising this curtailed authority courts act in an area where their inherent power derives not

> from the acts of congress . . . , but from the grant to them of all the judicial power of the nation by section 1 of article 3 of the constitution, which declares that "[t]he judicial power of the United States shall be vested in one supreme court and in such inferior courts as the congress may from time to time ordain and establish." The grant of the judicial power of the United States to these courts ex vi termini vested them with authority to enforce obedience to their orders and to punish disobedience and contempt of their authority by fine and imprisonment, because this authority

is an attribute of judicial power as inherent and indispensable as a judge. In re Nevitt, *supra*, 117 F. at 455. The Supreme Court long ago described the nature of the contempt power as follows:

> The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.

Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873). *See also* Watson v. Williams, 36 Miss. 331, 341 (1858):

> The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it.

Congress has placed the exclusive responsibility for admission to the practice of law in this jurisdiction in the United States District Court for the District of Columbia. 11 D.C.Code § 2101 (1967).[2] In exercise of that responsibility, the District Court had promulgated and published its local Rule 96, which provided at the time of the incidents herein described that

---

2. 11 D.C.Code § 2101 (1967):
   The United States District Court for the District of Columbia may make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion. . . .

[n]o person who is not a member of the Bar of the United States District Court for the District of Columbia shall engage in the general practice of law in the District of Columbia, or shall represent or hold himself or herself out directly or indirectly as being entitled or authorized to engage in the general practice of law in the District of Columbia. This rule shall not apply to practice before other federal courts or executive departments, government boards, commissions, or agencies, or to the holding out of the right to practice before such other federal courts or executive departments or government boards, commissions, or agencies.[3]

The latter part of the quoted rule was required because in this jurisdiction there are numerous "specialized bars" whose members practice either before various administrative agencies, (e. g., the "Communications Bar" practicing before the Federal Communications Commission) or before government departments (e. g., the "Patent Bar" practicing only before the Patent Office and Court of Customs and Patent Appeals), in addition to those specialist lawyers who practice only before the several other courts located in the District of Columbia (e. g., Court of Claims, Tax Court, Court of Military Appeals, etc.). There is naturally considerable confusion in the public mind as to just what is embraced in the generic term "lawyer," and the administrative problems confronting the District Court in its efforts to prevent the public from being misled as to the exact status of many persons who are for specialized purposes "lawyers," but who are not admitted to practice "general law," are complex and susceptible to no easy or final solution. In its efforts, then, properly to discharge its statutory responsibilities and simultaneously to recognize and tolerate a most incongruous situation resulting from the regrettable fact that many Washington "lawyers" are not members of the local bar, the District Court must remain acutely alert to the great potential for public misunderstanding of the exact status of individual practitioners. While the condition has received the patina of time, and while this vast majority of the members of the specialized bars meticulously avoid any misrepresentation as to their status and conscientiously refuse to accept cases beyond their areas of authority and competence, there still exists the danger that in isolated cases a non-member of the District Bar will accept professional employment in a field of the law in which his skill has not been tested and certified by admission to the local bar. There can be no proper abnegation of the District Court's responsibility to the public, the bar, and the judiciary to prevent such unfortunate occurrences. Although it would seem that by having authority to prescribe the rules for admission to the bar the District Court would have a powerful hand in alleviating the opportunities for illegal practice of law, experience has taught that control of the reins and control of the horse are two different things. The District Court, then, must constantly deal with the problems of the real situation while recognizing the public's ignorance of the apparent. "It is not enough that the doors of the temple of justice are open; it is essential that the ways of approach be kept clean." Hatfield v. King, 184 U.S. 162, 168, 22 S.Ct. 477, 479, 46 L.Ed. 481 (1902).

The District Court, like its predecessor, is not inexperienced in dealing with the multifold problems arising in its efforts to keep "the ways of approach" to its facilities "clean," and its authorized bar's practice strictly in accord with established professional standards. *See* Morgan v. United States, 114 U.S.App. D.C. 13, 309 F.2d 234 (1962), cert. denied, 380 U.S. 984, 85 S.Ct. 1353, 14 L. Ed.2d 276 (1965); United States v. Henson, D.C., 179 F.Supp. 474 (1959); Offutt v. United States, 98 U.S.App.D.C. 69, 232 F.2d 69 (1956); Jones v. United States, 80 U.S.App.D.C. 109, 151 F.2d 289

---

3. Local Rule 96 was replaced by the present Rule 93(j) on March 11, 1969.

(1945); Klein v. United States, 80 U.S. App.D.C. 106, 151 F.2d 286 (1945); Laughlin v. United States, 80 U.S.App. D.C. 101, 151 F.2d 281, cert. denied, 326 U.S. 777, 66 S.Ct. 265, 90 L.Ed. 470, (1945); Laughlin v. Eicher, 79 U.S.App. D.C. 266, 145 F.2d 700 (1944), cert. denied, 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945); In re Fletcher, 71 App.D.C. 108, 107 F.2d 666 (1939), cert. denied, 309 U.S. 664, 60 S.Ct. 593, 84 L.Ed. 1011 (1940); Bowles v. Laws, 59 App.D.C. 399, 45 F.2d 669 (1930), cert. denied, 283 U.S. 841, 51 S.Ct. 488, 75 L.Ed. 1452 (1931); Brown v. Miller, 52 App.D.C. 330, 286 F. 994 (1923).

The District Judge's decision here constituted another attempt to achieve these salutary goals, and I believe it was a valid one. To begin with, I agree with his conclusion that an attorney's appearance in court knowing he has no authority to appear is "[m]isbehavior [committed in the court's] presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1). In my opinion, the cases cited by the majority do not compel a different conclusion. Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919) and In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945) were based primarily on grounds which are not at all relevant to our present case. The allegedly contumacious conduct involved in these cases was a witness' giving of perjured testimony. In holding that this conduct did not constitute contempt when there was no physical obstruction of the administration of justice,[4] the Supreme Court was clearly motivated by an apprehension that witnesses would be intimidated if the opposite result were reached. Thus, in *Hudgings*, the Court said:

> If the conception were true, it would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for con-

tempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in a court would be gravely imperiled.

> . . . Indeed, when the provision of the commitment directing that the punishment should continue to be enforced until the contempt, that is, the perjury, was purged, the impression necessarily arises that it was assumed that the power existed to hold the witness in confinement under the punishment until he consented to give a character of testimony which in the opinion of the court would not be perjured.

(249 U.S. at 384, 39 S.Ct. at 340.) In *Michael* the Court noted that rather than being tried for contempt summarily, the petitioner "could have been indicted for [perjury], in which event a jury would have been the proper tribunal to say whether he or other witnesses told the truth." (326 U.S. at 226–227, 66 S.Ct. at 79.) It then went on to say the following:

> True, the Act of 1831 carries upon its face the purpose to leave the courts ample power to protect the administration of justice against immediate interruption of its business. But the references to that Act's history in the *Nye* case, *supra,* reveal a Congressional intent to safeguard constitutional procedures by limiting courts, as congress is limited in contempt cases, to "the least possible power adequate to the end proposed." Anderson v. Dunn, 6 Wheat. 204, 231. The exercise by federal courts of any broader contempt power than this would permit too great inroads on the procedural safeguards of the Bill of Rights, since contempts are summary in their na-

---

4. There was no obstruction of the administration of justice because in each case the judge concluded that the testimony in question was false before rendering his decision on the merits of the case.

ture, and leave determination of guilt to a judge rather than a jury. It is in this Constitutional setting that we must resolve the issues here raised.

(326 U.S. at 227, 66 S.Ct. at 79, 80.) Reading these two quotations from *Michael* together, it seems clear the Court felt that trial by jury following indictment was "adequate" to punish perjury when there was no physical obstruction of justice and that Congress therefore must not have intended to grant the courts an unnecessary and even dangerous power to punish this same conduct as contempt. *See also* Clark v. United States, 289 U.S. 1, 11–12, 53 S.Ct. 465, 77 L.Ed. 993 (1933). The substantial possibility that detrimental effects would result if the summary contempt power were used to punish perjury was thus the paramount consideration in both *Hudgings* and *Michael,* and for this reason I do not believe these decisions cast any light on the case before us.

I also feel that In re McConnell, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1961), on which the majority seems to place the greatest reliance, is not controlling here. The allegedly contumacious conduct involved in *McConnell* was a remark made by an attorney to the effect that he would continue asking questions which the judge had ruled were improper. A short recess was called after this remark was made, and the lawyer did not carry out his threat when the trial resumed. On these facts the Supreme Court reversed the attorney's contempt conviction, holding that an actual obstruction of justice was required before a person could be held in contempt under section 401(1).

Although the language of the opinion appears to set forth a general rule, I do not believe the Court meant to say that a physical obstruction of the administration of justice must be shown in every case to bring section 401(1) into operation. *See* In re McConnell, *supra,* 370 U.S. at 237, 82 S.Ct. 1288 (Harlan, J., dissenting). One reason why I reach this conclusion is that such a rule would be unworkable in some circumstances.

McConnell's conduct allegedly obstructed the trial, and it was, of course, possible to determine at trial whether this conduct was in fact obstructive. Where an attorney has defended an alleged criminal without authority to do so, however, his deception may go undiscovered at trial, yet form the basis for an inadequate representation of counsel claim which can be raised on a motion for post-conviction or habeas corpus relief long after the trial has been held. The example I give is not precisely our case, because the appellant here appeared in the District Court only to argue a motion for release of his client on bail pending appeal, and this issue is now moot. I believe the example does nonetheless demonstrate that the rule laid down in *McConnell* was not meant to apply where the allegedly contumacious conduct is such that it cannot be determined at trial whether the administration of justice will be obstructed, and this is certainly true in our case.

My example also leads me into the second ground for distinguishing *McConnell.* In *McConnell* the alleged contemnor, by not following through on his threat to continue asking forbidden questions, determined whether a physical obstruction of justice occurred. In our case and in the example discussed in the preceding paragraph, however, it is only the vagaries of the system which determine whether justice is physically obstructed. Assume, for example, that in our case the District Court judge had discovered during the course of the hearing before him that appellant was not a member of the bar of the court. The judge might well have discontinued the hearing until a properly admitted lawyer was appointed to argue the case, and there would thus have been an actual, physical obstruction of justice which was actionable under section 401(1). This being the case, I find it extremely difficult to say that identical conduct should go unpunished merely because the District Court judge was not aware of it at the time it occurred.

The third and final basis for distinguishing *McConnell* relates to the defi-

nition of the phrase "[m]isbehavior . . . obstruct[ing] the administration of justice." I read this phrase as encompassing conduct which, while it may not physically obstruct a trial or appeal, nonetheless threatens the judicial system as a whole. The conduct involved in *McConnell* does not pose such a threat, but I believe a lawyer's appearance in court in complete disregard of that court's rules regarding admission does, and thus should be held contumacious under section 401(1). Support for this belief is found in several federal cases. In Bowles v. United States, 50 F.2d 848 (4th Cir. 1929), the Fourth Circuit held it was contempt for an individual disbarred in the District of Columbia to obtain a federal court's permission to represent a criminal defendant by falsely stating that he was a member of the bar of the District. Significantly, the "lawyer's" conduct did not obstruct the administration of justice in the narrow sense in which this term is used by the majority. *Bowles* is not an aberration in the law, for in Clark v. Allen, *supra,* Justice Cardozo cited it for the general proposition that "[d]eceit by an attorney may be punished as a contempt if the deceit is an abuse of the functions of his office." (*Id.,* 289 U.S. at 12, 53 S.Ct. at 468.) United States v. Temple, 349 F.2d 116 (4th Cir. 1965) likewise held that lying by an attorney constitutes contempt. Finally, in United States v. Henson, 179 F.Supp. 474 (D.D.C.1959), our District Court held that a lawyer committed contempt where he did not disclose to the court his knowledge that a juror had learned the facts of the case. As in *Bowles* and *Temple,* the court did so even though there had been no "technical" obstruction of justice; it apparently felt the conduct "cuts so deeply into the heart's core of our judicial sys-

tem" that in a more profound sense it obstructed the administration of justice. (*Id.* at 476.)

In summary, then I believe that the conduct which appellant is charged with poses a serious danger of disruption of the judicial process and is also so inherently detrimental to the judicial system that it obstructs the administration of justice without regard to whether such a disruption occurred. Accordingly, I believe the District Judge correctly concluded that such conduct is actionable under section 401(1).[5]

I also agree with the District Judge's holding that the conduct at issue here evidenced a contumacious intent. This appellant, knowing that he was not a member of the bar of the District Court and that he had no authority to appear there other than that conceivably provided by this court's order, nevertheless undertook to act as a lawyer in the District Court. While his appearance in this capacity without first informing the District Court of his exact status may not be contempt per se, I believe the trier of fact was entitled to infer from this action that appellant knowingly appeared without authority. The majority reaches the opposite result because it feels appellant might well have been innocently mistaken as to the effect of his appointment by this court. In support of its position, the majority sets forth a rather ingenious legal theory which appellant could have relied upon in assuming his appointment gave him authority to appear in the District Court. However, it strains credibility to suppose that appellant would propound this legal theory rather than simply inquiring as to whether he was authorized to appear and argue the motion. More importantly, the evidence does not support the conclusion that he believed his appear-

---

5. An attorney's appearance in the District Court in violation of Rule 96 may also be actionable under section 401(3) which defines as contempt any "[d]isobedience or resistance to [the court's] lawful writ, process, order, rule, decree, or command."

*See* Seymour v. United States, 373 F.2d 629 (5th Cir. 1967). However, since I feel this conduct qualifies as contempt under section 401(1), it is unnecessary for me to decide this question.

ance in the District Court was authorized in any way. In his letter to the clerk of this court, appellant said that he "would have to be specially admitted to accept an appointment," thereby indicating that he correctly believed an appointment to represent an indigent did not itself convey authority to appear in court. The letter he subsequently received from the clerk's office contained an order appointing him to represent one Daniel Porter, and this order stated that appellant was *"a member of the bar of this court."* (J.A. 8, 10) (Emphasis added.) Appellant was thus on notice that the court appointed him on the erroneous assumption that he was already a member of its bar. In view of this glaring mistake appearing in the order appointing appellant, it is difficult for me to understand how this order could have altered appellant's original belief that special admission was required. Consequently, I believe it can easily be inferred that appellant entered his appearance in the District Court knowing full well he did not have authority to do so. The fact that appellant signed his pleadings as "Counsel for Appellant Appointed by United States Court of Appeals for the District of Columbia Circuit" in no way convinces me that his conduct was innocent. Viewed in context, this action was, I believe, the perpetration of a large falsehood by the selection of a small truth.

Since I believe the conduct which appellant is charged with is actionable under the contempt statute and that the evidence is sufficient to establish that he willfully engaged in the forbidden conduct, I am inclined to affirm his conviction. To fully explain my ground for affirmance, however, it is necessary for me to discuss two issues which the majority does not find it necessary to decide.

## II.

The contempt, says appellant, was "so entangled with the judge's personal feelings" against him as to require the judge as "an actor in the involved events" to have the proceedings assigned for disposition by another judge. (Brief for the Appellant at 22.) While I basically believe that in proceedings against attorneys for contempt committed in the presence of the court the better practice is to have a non-participant judge hold the adjudication hearing, I am not prepared to hold that this is an absolute rule which must be followed in all cases. I accept the mandate of Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L. Ed. 767 (1925), not only because it is binding upon me, but also because I recognize its inherent wisdom and fairness. The *Cooke* doctrine holds that "where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge, *called upon to act in a case of contempt by personal attack upon him,* may, without flinching from his duty, properly ask that one of his fellow judges take his place." (267 U.S. at 539, 45 S.Ct. at 396; emphasis added.) This rule was relied upon by the Suupreme Court in its more recent cases of Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954) and Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). Obviously the Supreme Court in its rulings in this area has been impelled to seek a balance between the need to protect the process of orderly trial and the need to assure the fairness of contempt proceedings against attorneys from any bias or prejudice potentially rooted in a judge's personal feeling of grievance against that counsel. Fundamentally, the purpose is to avoid the situation which confronted de Seze on December 11, 1792, when he appeared before the French legislative assembly, which had declared itself a court as well as a legislature, as appointed counsel to his king, and told the convention: "I look everywhere for judges but find only accusers."

### III.

Finally, appellant pleads that the sentence imposed upon him is grossly excessive. I face in this challenge to the trial court's action what is for me the most difficult aspect of this case. Convinced from the record that appellant's criminal contempt was willful, I am, nevertheless, unhappily cognizant of the basic fact that clerical error within our court set in motion the entire series of events resulting in the present appeal to us. I must, then, openly admit that I feel substantially restricted in disposing of this case. In the abstract, appellant's failure to make at least some affirmative inquiry of us as to his status, or as to whether a mistake had been made in the light of his own earlier statement that if appointed he would have to be "specially admitted" (J.A. 4), justifies a conclusion that our error was dwarfed into insignificance by appellant's conduct. Unfortunately, abstractions refuse to remain abstract but rather turn automatically into images, and we are then confronted with the image of this appellant serving a jail sentence brought about, at least initially, by erroneous conduct within our own official family. I cannot ignore our culpability in this situation and, like parricide in the Athenian law, pass it over in silence. I am conscious of my responsibilities to maintain the integrity of established juridical procedures and anxious to fulfill them, but I recognize also that "justice must satisfy the appearance of justice." Offutt v. United States, supra, 348 U.S. at 14, 75 S.Ct. at 13.

Because of our part in the facts leading up to appellant's conviction and because I feel that forty-five days in durance vile is in any event too severe a punishment for the conduct appellant engaged in, I would affirm his conviction but suspend execution of the sentence imposed on him. 28 U.S.C. § 2106 (1964); *see* Green v. United States, *supra,* 356 U.S. at 188, 78 S.Ct. 632, 2 L.Ed. 2d 672.