**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JAMES KIMSEY,
          *Defendant-Appellant.*

No. 10-16800

D.C. No.
2:08-cv-00635-
PMP-GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
August 31, 2011—San Francisco, California

Filed February 8, 2012

Before: Marsha S. Berzon and Jay S. Bybee, Circuit Judges,
and James L. Graham, Senior District Judge.*

Opinion by Judge Berzon

---

*The Honorable James L. Graham, Senior District Judge for the U.S.
District Court for Southern Ohio, Columbus, sitting by designation.

## COUNSEL

Daniel G. Bogden, United States Attorney, Robert L. Ellman, Appellate Chief, District of Nevada, Peter S. Levitt (argued), Assistant United States Attorney, Las Vegas, Nevada, for plaintiff-appellee United States of America.

Franny A. Forsman (argued), Federal Public Defender, Las Vegas, Nevada, for defendant-appellant James Kimsey.

## OPINION

BERZON, Circuit Judge:

James Edward Kimsey ("Kimsey") has in the past engaged in the unauthorized practice of law as well as other dishonest

activities involving the legal system. Alluding to his recent exploits, the government characterized Kimsey as a charlatan. Whether that is so or not, our legal system does not punish people simply because they have been proven unscrupulous in the past and are continuing to engage in dubious activities. That is why "the government may not . . . prove that the defendant is a bad person, simply to show that in all likelihood he acted criminally on the occasion at issue." *United States v. Martinez*, 182 F.3d 1107, 1111 (9th Cir. 1999). Rather, the legal system punishes people for proven violations of specific laws.

In the case before us, Kimsey was convicted of criminal contempt of court in violation of 18 U.S.C. § 402. The contemptuous act for which the district judge convicted Kimsey, who is not a lawyer, was the "ghostwriting" of eight pleadings for a *pro se* litigant in a civil lawsuit. Section 402 provides that any person who willfully disobeys a "rule . . . of any district court" shall be prosecuted for contempt if the contumacious act also constitutes "a criminal offense . . . under the laws of any [s]tate." 18 U.S.C. § 402. The district court premised Kimsey's § 402 conviction on its finding that Kimsey violated (1) Local Rules IA 10-1 and 10-2 of the U.S. District Court of Nevada, which govern the admission of attorneys seeking to practice law in the District; and (2) Nevada Revised Statute § 7.285, which prohibits persons from "practic[ing] law" if they are not members of the Nevada State Bar or have not gained admission to practice *pro hac vice*.

Kimsey now appeals his conviction on four grounds, contending that: (1) he was denied his statutory right to a jury trial; (2) he could not be prosecuted for criminal contempt under 18 U.S.C. § 402 on the basis that he did not comply with Local Rules 10-1 and 10-2; (3) § 7.285 is unconstitutionally vague as applied to him; and (4) he did not violate § 7.285. We reverse Kimsey's conviction based on the first two points and so do not reach the latter two.

## I.

## Background

### A.   "Ghostwriting"

In 2008, Frederick Rizzolo ("Rizzolo") became embroiled in a contentious, scorched-earth lawsuit, in which eighteen lawyers bombarded each other and the district court with over 500 pleadings. Plaintiffs Kirk and Amy Henry ("the Henrys") initiated the suit after Kirk's fateful visit to Rizzolo's Crazy Horse Too "gentleman's club" in Las Vegas, where Kirk was attacked so ferociously that he became a quadriplegic. The Henrys sued Rizzolo and others for damages, and sought attachment of assets that Rizzolo and his wife had allegedly concealed through a collusive divorce and through various cash transactions with third parties, involving millions of dollars.

On January 22, 2009, Rizzolo's attorneys withdrew from representing him. From then until October 6, 2009, Rizzolo proceeded without an attorney. During that period, Rizzolo initially filed documents that bore the stamp of a *pro se* litigant. For example, he submitted handwritten responses to interrogatories, producing such answers as, "I don't believe I am an heir to any other persons [sic] will. But not sure."

In July and August 2009, however, while still purportedly proceeding without a lawyer, Rizzolo filed eight documents that seemed to reflect somewhat more familiarity with the legal system than had his initial *pro se* efforts. Those documents, styled as filed by "Frederick J. Rizzolo, Pro Se," sought, among other things, stays of discovery, dismissal, summary judgment, and disqualification of the Henrys' attorney. A number of the filings raised legal arguments and cited precedent.

The Henrys' lawyers received the first of these documents, a motion to dismiss, by fax on July 9, 2009. Defending prop-

erty transfers arising from Rizzolo's Nevada divorce, the motion advanced a series of contentions ranging from the supposed impact of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), to the applicability of the domestic relations exception to federal diversity jurisdiction. The motion asserted, for example:

> *Begay v. Kerr-McGee Corp.*, 682 F.2d 1311 (9th Cir. 1982), citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 82 L. Ed. 1188 (1938) (the "Erie doctrine") brings forth a central issue in this case. Should this Court decline to dismiss for lack of personal and subject matter jurisdiction under the heretofore described theories of lack of complete diversity and the domestic relations exception to diversity, then the Erie doctrine requires that the federal court grant or withhold relief as if decided by the state courts.

Jack DeGree ("DeGree"), the Henrys' attorney, testified that the bottom of the fax they received had a tag line that appeared to identify the sender of the document as "Kimsey." Subsequently, DeGree received the official version of this motion through the district court's CM-ECF filing system. This version included an appendix of exhibits, one of which bore what appeared to be a computer file path containing the name "James Edward Kimsey."

Surprised by the motion and the more than 200 pages of exhibits, DeGree contacted Rizzolo on July 22, 2009 to request an extension of time for responding. DeGree found the ensuing conversation "rather odd," given his prior dealings with Rizzolo: In the past, Rizzolo had always been "very agreeable" in phone conversations; this time, Rizzolo replied that he wanted "to think about" DeGree's request and would return his phone call. About an hour later, DeGree did receive a return call, but not from Rizzolo. Instead, the caller "identified himself as James on behalf of Rick Rizzolo." James refused to agree to any extension unless the plaintiffs agreed

to a stay of discovery. Although James provided DeGree with a return phone number at which he could be reached, he would not reveal his last name when asked, either then or in a later phone call DeGree instigated to decline the stay. DeGree also asked James whether he was an attorney, a question that apparently hit a raw nerve. At that point James yelled back, "I'm not answering your questions, Mr. DeGree."

## B.  "Ghost-busting"

Immediately after the second phone call with James, DeGree contacted Dave Groover, a private investigator. DeGree asked Groover to trace the phone number James had provided, which turned out to be registered to "James E. Kimsey." Given this information, as well as the faxed motion bearing the name "Kimsey" and the exhibit with the file path containing "James E. Kimsey," DeGree and Groover ascertained that Kimsey was likely the "ghostwriter" of the documents filed by Rizzolo.

DeGree proceeded to file with the district court on the Henrys' behalf a Motion to Reveal Pro Se Litigant Rick Rizzolo's Ghost Writer. He attached a declaration from Groover indicating that Kimsey was the probable author of Rizzolo's pleadings. DeGree also attached records showing that Kimsey had been convicted for unauthorized practice of law in Nevada in 1987.[1] The motion requested that Rizzolo be required to reveal the identity of the person who had authored the eight documents he had filed during the previous two months.

At the hearing before a magistrate judge on the Henrys' motion, Rizzolo appeared with his new counsel, Kenneth Frizzell ("Frizzell"). Just before the hearing began, Groover spotted Kimsey outside the courthouse. When Groover

---

[1] Based on the same set of incidents, Kimsey had also been convicted of forgery, perjury, conspiracy to commit perjury, and offering a false instrument for filing, in violation of Nevada law.

approached Kimsey to serve him with a subpoena, Kimsey refused to take the document.

At the hearing, Frizzell acknowledged that Rizzolo had used Kimsey's services to prepare and file the eight documents. Addressing Kimsey's actions, the magistrate judge entered a written order finding that "Rizzolo had used the services of Mr. James E. Kimsey to prepare and file pleadings with the Court." "In doing so," the magistrate judge determined, "Defendant Rick Rizzolo allowed a non-attorney to determine the legal sufficiency of the instruments filed with the Court and relied on Mr. Kimsey's judgment in applying legal knowledge to the specific issues pending in this action." Concluding, based on these findings, that Kimsey had engaged in unauthorized practice of law on behalf of Rizzolo, the magistrate ordered Rizzolo to cease using Kimsey's services and struck the eight documents Kimsey had prepared.

Soon thereafter, the matter escalated into a criminal proceeding. The magistrate judge issued an order to Kimsey to show cause as to why he should not be held in criminal contempt. Reiterating that Kimsey appeared to have engaged in the unlawful practice of law, the magistrate judge requested that the government prosecute Kimsey pursuant to Federal Rule of Criminal Procedure 42(a)(2) for the alleged contempt. *See* Fed. R. Crim. P. 42(a)(2) ("The court must request that the contempt be prosecuted by an attorney for the government . . . ."). In response to the request, the U.S. Attorney instigated a prosecution of Kimsey for criminal contempt. The scope of the prosecution was defined by the magistrate judge's Order to Show Cause, which constituted the sole charging document. The Order charged Kimsey with helping Rizzolo "prepare and file [the] eight pleadings," stating that "it appears that Mr. Kimsey's actions as a non-attorney in preparing and filing legal instruments constitutes the unauthorized practice of law on behalf of Defendant Rick Rizzolo." Based on these specific alleged actions, the order charged Kimsey with violating:

[(1)] The Local Rules of Practice of the United States District Court for the District of Nevada[, which] require that in order to be eligible to practice before the District Court, an attorney must be admitted to practice before the Supreme Court of Nevada or, if the attorney is appearing *pro hac vice*, that he or she be a member in good standing and eligible to practice before the bar of any jurisdiction in the United States . . . [; and (2)] Nevada Revised Statute (NRS) 7.285[, which] makes it unlawful for a person to practice law in Nevada if the person is not an active member of the State Bar of Nevada or otherwise authorized to practice law in Nevada.

*See* D. Nev. L.R. IA 10-1, 10-2; Nev. Rev. Stat. § 7.285.[2]

---

[2]The text of Rule 10-1 provides, in relevant part:

In order to practice before the District . . . Court, an attorney must be admitted to practice under the following provisions. An attorney who has been admitted to practice before the Supreme Court of Nevada, and who is of good moral and professional character, is eligible for admission to the Bar of this Court.

D. Nev. L.R. IA 10-1(a)(1).

In addition, Rule 10-2 states, in relevant part:

An attorney who is not a member of the Bar of this Court, who has been retained or appointed to appear in a particular case, may do so only with permission of this Court. Application for such permission shall be by verified petition on the form furnished by the Clerk. . . . The petition shall state . . . [t]he court or courts to which the attorney has been admitted to practice and the date of such admission.

D. Nev. L.R. IA 10-2(a), (b)(2).

Finally, § 7.285 sets forth, in relevant part, "A person shall not practice law in this state if the person . . . [i]s not an active member of the State Bar of Nevada or otherwise authorized to practice law in this state pursuant to the rules of the Supreme Court . . . ." Nev. Rev. Stat. § 7.285(1)(a); *see also* Nev. Sup. Ct. R. 42 (regulating the "[p]ractice of attorneys not admitted in Nevada"); Nev. Sup. Ct. R. 42.1 (regulating the "[p]ractice of attorneys admitted in Nevada but not maintaining Nevada offices").

In his acceptance of service of the magistrate judge's order, Kimsey expressly reserved his right to a trial by jury. Nonetheless, Kimsey's criminal contempt proceedings took the form of a bench trial before the district court.

The testimony at trial established that Kimsey was not an attorney, and that he did not hold himself out as an attorney to Rizzolo. There was no evidence that Rizzolo had paid Kimsey for his services.

At the same time, the evidence also indicated that Kimsey had provided Rizzolo with legal assistance so substantial as to mimic those an attorney would offer. To test whether this was so, the district judge questioned Rizzolo about the substance of the pleadings he had filed under his name during July and August 2009. With respect to the motion for summary judgment, for example, the judge asked, "What did you understand Rule 56 to encompass?" Rizzolo replied, "I don't know. I've read so many of these, your Honor." The judge then pressed, "[W]hat's your understanding of the standard that would have to be met for a party to be entitled to [s]ummary [j]udgment upon a claim or a case?" Rizzolo's response confirmed that he must have had little to do with the motion he had purportedly filed:

> I would have to read it and go back to look and see what it was. . . . Summary [j]udgment would be that we were asking that—you know, we would come in here and based on—I don't know what this particular one is, but that, you know, we're asking for you basically—for a [s]ummary [j]udgment from you to I believe it was to dismiss the case or whatever that one was about.

Similarly, when the district judge questioned Rizzolo about his motion to dismiss, which relied on the *Erie* and *Rooker-Feldman* doctrines, Rizzolo conceded that he had never read *Erie*, 304 U.S. 64, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413

(1923), or *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

After hearing Rizzolo's testimony, as well as that of other witnesses, the district court noted the difficulty of defining what constitutes the practice of law: "we know it when we see it or the courts know it when they see it." Nevertheless, the court concluded that "this clearly is a case that crosses the line between simply providing assistance or offhand recommendations of looking at a particular case," and summarized its findings of the services that Kimsey had provided Rizzolo as follows:

> Mr. Rizzolo, whether it's through suggestions of others or just his own conjured up views on something, raises with Mr. Kimsey, asks Mr. Kimsey if [t]here's a case or [to] research[ ] a particular point. Mr. Kimsey conducts the research. Mr. Kimsey writes an argument, gives it to Mr. Rizzolo to analyze, review, edit, whatever—factually correct certainly. And ultimately the [eight] products that are filed [in July and August 2009] are documents the Court finds beyond a reasonable doubt authored by Mr. Kimsey.

In support of these findings, the court noted that the eight documents "are clearly in the form of pleadings citing case authority that had been researched, that had been structured or formatted in a way to present legal arguments seeking specific relief including dismissal of the claims against Mr. Rizzolo," and that Rizzolo responded affirmatively when asked, "Wasn't what you did with Mr. Kimsey what you did with your attorneys?"

The court had "no difficulty" holding that Kimsey had violated Local Rules IA 10-1 and 10-2 of the district court, as well as Nevada Revised Statute § 7.285, based on his role in preparing and filing the eight pleadings. In addition, the court relied on the following facts to find that Kimsey had *willfully*

violated these provisions, as required for a conviction under § 402: Kimsey had been convicted of unauthorized practice of law in the past; he had failed to sign the eight pleadings; he had not "identif[ied] himself"; he had "refused to acknowledge his status"; and he had declined to receive service.[3] After concluding that "the factors set forth in [the magistrate judge's] Order to Show Cause . . . have been satisfied beyond a reasonable doubt by the evidence," the district court convicted Kimsey of criminal contempt under 18 U.S.C. § 402.

## II.

## Discussion

### A.   Jury trial

We first consider Kimsey's argument that the trial court committed reversible error by disregarding his statutory right to a jury trial and instead convicting him after a bench trial. We review de novo the question whether Kimsey was entitled to a jury trial under 18 U.S.C. § 402 and § 3691, *see United States v. Male Juvenile*, 280 F.3d 1008, 1021 (9th Cir. 2002), and decide that he was.

**[1]** Section 402 provides that any prosecution under that provision must be carried out in accordance with § 3691.[4] Section 3691, in turn, creates a statutory right to a jury trial for those prosecuted under § 402:

---

[3]Notably, the court did not conclude that these actions—that is, Kimsey's failure to "identify himself" and his "refus[al] to acknowledge his status"—themselves constituted violations of Local Rules 10-1 and 10-2 or unauthorized practice of law. Rather, the court listed these actions as, together, supporting the determination that Kimsey had acted willfully in violating Local Rules 10-1 and 10-2, by "suggest[ing] an awareness . . . his intent, his willful conduct that what he was doing he knew he could not lawfully do, and yet he intentionally went forward and did it."

[4]*See* 18 U.S.C. § 402 ("Any person . . . willfully disobeying any lawful . . . rule . . . of any district court of the United States . . . shall be prosecuted for such contempt as provided in section 3691 of this title . . . .").

> Whenever a contempt charged shall consist in willful disobedience of any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing or omitting any act or thing in violation thereof, and the act or thing done or omitted also constitutes a criminal offense . . . *the accused, upon demand therefor, shall be entitled to trial by a jury*, which shall conform as near as may be to the practice in other criminal cases.

18 U.S.C. § 3691 (emphasis added). Although the right to jury trial under § 3691 is contingent upon a "demand" therefor, the statute does not specify that a defendant must "demand" a jury trial in any particular manner or at any particular stage of the proceedings. In his acceptance of service to the magistrate judge's Order to Show Cause for why he should not be held in criminal contempt, Kimsey explicitly reserved his right to a trial by jury. This reservation constituted a "demand" for a jury trial in ordinary English, and nothing in § 3691 requires that we disregard it.

**[2]** Moreover, Federal Rule of Criminal Procedure 23 states that "[i]f the defendant is entitled to a jury trial, the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves." Fed. R. Crim. P. 23. Because Kimsey never waived his statutory right to a jury trial, the district court erred in conducting a bench trial rather than a jury trial.

The government contends that Kimsey was not entitled to a jury trial because it was stipulated at Kimsey's initial appearance that he could not be imprisoned for more than six months. Although this proposition is correct as a matter of *constitutional* law, *see Taylor v. Hayes*, 418 U.S. 488, 495 (1974), Kimsey argues that he had a *statutory* right to a jury trial. Because § 402 carries with it a maximum sentence of six months, its reference to § 3691 would be entirely meaningless if it did not create a right to a jury trial where defendants are

sentenced to six months or less of imprisonment. The government's contention therefore fails.

**[3]** Deprivation of the right to a jury trial constitutes structural error requiring reversal. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993). Accordingly, we hold that the failure to try Kimsey by jury mandates reversal of his criminal contempt conviction.[5]

## B.   18 U.S.C. § 402

Although the conviction cannot stand for failure to provide a trial by jury, we proceed to consider a second ground for reversal—whether the district court properly held that Kimsey could be convicted of criminal contempt under 18 U.S.C. § 402 because he violated Local Rules 10-1 and 10-2. The answer to this question will govern whether there can be any further proceedings on the criminal contempt allegations, and so has consequences beyond reversal of the conviction for procedural error. Under these circumstances, it is appropriate for us to address the issue. *See, e.g.*, *United States v. Shetler*, ___ F.3d ___, No. 10-50478, 2011 WL 6794021, at *8-*9 (9th Cir. Dec. 28, 2011).

Kimsey contends that he cannot be convicted under § 402 for violation of the Local Rules. We agree. We hold that § 402 does not permit convictions for criminal contempt for violations of standing rules of court. Because we so conclude,

---

[5]By reserving his right to a jury trial, Kimsey not only made an adequate "demand therefor," 18 U.S.C. § 3691, but also adequately raised this issue before the district court so as to merit de novo review on appeal. Even if that is not the case and plain error review should apply because Kimsey did not raise, during the trial itself, his statutory argument that he was entitled to a jury trial, " '[w]e only review for plain error or assess whether an error is harmless when the error is not structural.' " *United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004) (quoting *United States v. Sanchez-Cervantes*, 282 F.3d 664, 670 (9th Cir. 2002)).

we need not reach the question whether Kimsey violated the particular Local Rules alleged.

**[4]** Section 402, the federal criminal contempt statute under which Kimsey was convicted, provides, in relevant part, that a person is guilty of criminal contempt if he "willfully disobey[s] any lawful writ, process, order, *rule*, decree, or command of any district court . . . if the act or thing so done be of such character as to constitute also a criminal offense . . . under the laws of any [s]tate." 18 U.S.C. § 402 (emphasis added). Kimsey maintains, and the government agrees, as do we, that § 402 requires that the *same* act violate both a criminal statute and a district court "rule." In finding Kimsey punishable for criminal contempt under § 402, the district court determined that Kimsey violated Local Rules IA 10-1 and 10-2 and Nevada Revised Statute § 7.285.

### 1. Whether Rules 10-1 and 10-2 apply to non-attorneys

Kimsey contends that he cannot be lawfully convicted under § 402 because he did not violate either Local Rule 10-1 or 10-2, the two predicate district court "rule[s]," on which the district court premised his § 402 conviction. *See* 18 U.S.C. § 402; D. Nev. L.R. IA 10-1, 10-2. Local Rules 10-1 and 10-2 regulate the admission of attorneys to practice law before the District Court for the District of Nevada. *See* D. Nev. L.R. IA 10-1, 10-2. Rule 10-1 regulates the admission of attorneys who are members of the Nevada Bar; Rule 10-2 regulates the admission of attorneys who are not members of the state bar to practice in particular cases, a limited admission sometimes termed "*pro hac vice*." *See Black's Law Dictionary* 1331 (9th ed. 2009). Kimsey argues that Rules 10-1 and 10-2 apply *only to attorneys* and therefore do not apply to him, because he is not a lawyer. *See* D. Nev. L.R. IA 10-1(a)(1) ("In order to practice before the District . . . *an attorney* must be admitted to practice under the following provisions.") (emphasis added); *id*. R. 10-2(a) ("*An attorney* who is not a member of

the bar of this Court, who has been retained or appointed to appear in a particular case, may do so only with permission of the Court.") (emphasis added). Although Kimsey might very well prevail on this ground were it pertinent, on our reading of § 402, it is not. Kimsey could not be convicted under that provision even if he violated the local rules.

## 2. "Rule" within the meaning of § 402

**[5]** Neither § 402 nor Ninth Circuit precedent defines what constitutes a district court "rule" for purposes of a § 402 contempt conviction. *See* 18 U.S.C. § 402. Both we and the Seventh Circuit have assumed, without directly addressing the issue, that local court rules do qualify as such predicate "rule[s]." *See United States v. Marthaler*, 571 F.2d 1104, 1105 (9th Cir. 1978) (affirming the defendant's conviction for criminal contempt, under 18 U.S.C. § 401, based on his violation of a local court rule); *United States v. Kozel*, 908 F.2d 205, 208 (7th Cir. 1990) (same). However, "'unstated assumptions on non-litigated issues are not precedential holdings binding future decisions.'" *Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009) (quoting *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985)).

**[6]** In contrast, the D.C. Circuit has addressed the issue (albeit without deciding it), suggesting that the term "rule" does not include "general, standing rule[s] of court." *In re Brown*, 454 F.2d 999, 1006 (D.C. Cir. 1971). In interpreting 18 U.S.C. § 401, the sister provision of § 402,[6] the D.C. Circuit reasoned:

---

[6]Section 401 grants federal courts the power to punish "[d]isobedience or resistance to its lawful writ, process, order, rule, decree or command." *Compare* 18 U.S.C. § 401, *with id.* § 402 (providing criminal sanctions for the "willful[ ] disobe[dience of] any lawful writ, process, order, rule, decree, or command of any district court").

> Since every other directive which [§ 401] speaks of
> —"writ, process, order, . . decree, or command"—is
> one which is specifically addressed to a particular
> person or group and one which traditionally has been
> enforceable through the contempt power, it may be
> that the "rule" to which [§ 401] refers is the rule *in
> the process sense*—the rule to show cause, the rule
> nisi, and the like—*rather than a general, standing
> rule of court*, which usually draws its sanctions from
> other sources.

*Id*. (emphases added); *cf. United States v. Rose*, 806 F.2d 931, 932 (9th Cir. 1986) (affirming the trial court's holding that a defendant was in criminal contempt, where the defendant "refus[ed] to testify after repeated warnings by the court"); *United States v. Powers*, 629 F.2d 619, 621 (9th Cir. 1980) (affirming a defendant's sentence of imprisonment for criminal contempt, where the defendant "was told repeatedly that his refusal to testify could result in a judgment of contempt and a jail sentence").

**[7]** There are several reasons why we conclude that the D.C. Circuit's suggestion is correct. The first derives from the evolution of language over time, a not-infrequent source of error in interpreting statutes of long-standing vintage. *See, e.g.*, *Mitchell v. Helms*, 530 U.S. 793, 839 (2000) (O'Connor, J., concurring) ("[T]he evolution in the meaning of the term ['neutrality'] in our jurisprudence is cause to hesitate before equating the neutrality of recent decisions with the neutrality of old.").

The original version of § 402 was passed as part of the Clayton Act of 1914 and contained substantially the same language as the current version. *Compare* Clayton Act, ch. 323, § 21, 38 Stat. 730, 738 (1914) ("[A]ny person who shall willfully disobey any lawful writ, process, order, *rule*, decree, or command of any district court . . . shall be proceeded against for his said contempt as hereinafter provided.") (emphasis

added), *with* 18 U.S.C. § 402 ("Any person . . . willfully disobeying any lawful writ, process, order, *rule*, decree, or command of any district court . . . shall be prosecuted for such contempt as provided in section 3691 of this title . . . .") (emphasis added). In addition, the initial version of § 401was passed as part of the Act of March 3, 1911, and included language similar to that found in the current version of both that provision and § 402. *Compare* Act of Mar. 3, 1911, ch. 231, § 268, 36 Stat. 1087, 1163 ("[Federal courts] shall have power . . . to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: *Provided*, [t]hat such power to punish contempts shall not be construed to extend to any cases except . . . the disobedience or resistance . . . to any lawful writ, process, order, *rule*, decree, or command of the said courts." (emphasis added)), *with* 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." (emphasis added)).

**[8]** According to definition 3 of the noun "rule" in the 1910 version of *Black's Law Dictionary*—the version published just one year before Congress passed the Act of March 3, 1911, and four years before it passed the Clayton Act—a "rule" is "[a]n order made by a court, at the instance of one of the parties to a suit, commanding a ministerial officer, or the opposite party, to do some act, or to show cause why some act should not be done." *Black's Law Dictionary* 1046 (2d ed. 1910). The same edition of *Black's* defines the verb "rule" in definition 1 as "to command or require by a rule of court; as, to rule the sheriff to return the writ, to rule the defendant to plead." *Id.* This definition itself uses "rule" as a noun in a manner consistent with *Black's* definition 3 of the noun "rule."[7]

---

[7]The current *Black's* no longer contains a definition of "rule" consistent with definition 3 of the 1910 edition. *See Black's Law Dictionary* 1446

Similarly, according to definition 4(a) of the noun "rule" in *the Oxford English Dictionary* (OED), a "rule" is "[a]n order made by a judge or court with reference to a particular case only; a ruling." *Oxford English Dictionary* (3d ed. 2011) ("OED"). While noting that this usage is now rare, the OED goes on to quote from a news report of a fairly recent British judicial decision that turned on the same language evolution we face here. The article explained the use of the term in the nineteenth century: " '[R]ules' were . . . a term denoting decisions or rulings by the judiciary on a case by case basis." *Id.* (second alteration in original) (quoting *Law Report May 22 1991 House of Lords: Costs Automatically Follow Acceptance of Money Paid in Court*, Times (London), May 22, 1991). The OED also provides an example of the usage from a 1910 case: "Any violation of the judge's rule in regard to the sequestration is punishable as for contempt." *Id.* (quoting *Thomas v. State*, 67 S.E. 707, 708 (Ga. Ct. App. 1910)).[8] As

---

(9th ed. 2009) (defining the noun "rule" as "[g]enerally, an established and authoritative standard or principle; a general norm mandating or guiding conduct or action in a given type of situation").

However, the current version of *Black's* does define the term "*rule nisi*," a compound term that appears to be derived from the outmoded usage of "rule" discussed in the text. Specifically, *Black's* defines "*rule nisi*" as "*decree nisi*," that is "[a] court's decree that will become absolute unless the adversely affected party shows the court, within a specified time, why it should be set aside." *Id.* at 472, 1448. The 1910 version of *Black's* defined "*rule nisi*" in a similar manner as "[a] rule which will become imperative and final *unless* cause be shown against it. This rule commands the party to show cause why he should not be compelled to do the act required, or why the object of the rule should not be enforced." *Black's Law Dictionary* 1047 (2d ed. 1910). The D.C. Circuit mentioned the *rule nisi* as an example of how the term "rule" could have been used to refer to courts' directives to specific persons or groups. *See Brown*, 454 F.2d at 1006. As *Black's* and *Brown* suggest, "*rule nisi*" is likely a surviving example of the usage of "rule" discussed in definition 3 of the 1910 version of *Black's*. *See Black's Law Dictionary* 1046-47 (2d ed. 1910).

[8]*Thomas* held that where a witness has been purposely kept in the courtroom in disobedience of a judge's sequestration order, either the person who caused him to remain in the courtroom or the witness himself may be punished for contempt. *See* 67 S.E. at 708.

this last OED example confirms, the term "rule," as used in the first decades of the twentieth century—which is when § 401 and § 402 were originally enacted—could well have referred to a judge's edict in a specific case rather than general, standing court rules.

**[9]** Second, although standing court rules already existed in the early twentieth century,[9] and so, based on etymology alone, it would not be inconceivable that § 402's use of the term "rule" referred to them, this possibility is severely undermined by the application of a basic canon of statutory interpretation: "The canon, *noscitur a sociis*, reminds us that a word is known by the company it keeps, and is invoked when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *S.D. Warren Co. v. Maine Bd. of Envt'l Prot.* 547 U.S. 370, 378 (2006) (internal citation and quotation marks omitted). Applying this "commonsense canon . . . which counsels that a word is given more precise content by the neighboring words with which it is associated," *United States v. Williams*, 553 U.S. 285, 294 (2008), demonstrates that of the two meanings of "rule" extant in the early twentieth century, the meaning intended was the one denoting a context-specific legal pronouncement, rather than the one denoting a generally applicable regulation.

Within § 402, the term "rule" constitutes one of a "string of statutory terms," *S.D. Warren Co.*, 547 U.S. at 378, each of which most usually connotes a direct, situation-specific directive to a particular individual. See *Black's Law Dictionary* 1747 (9th ed. 2009) (defining "writ" as "[a] court's written order, in the name of a state or other competent legal authority, commanding the addressee to do or refrain from doing

---

[9]*See, e.g.*, Equity R. 79 (1912) ("[T]he District Courts may make any other and further rules and regulations for the practice, proceedings and process, mesne and final, in their respective districts, not inconsistent with the rules hereby prescribed, and from time to time alter and amend the same.").

some specified act."); *id*. at 1325 (defining "process" as "[a] summons or writ, esp[ecially] to appear or respond in court"); *id*. at 1206 (defining "order" as "[a] command, direction, or instruction" or a "[a] written direction or command delivered by a court or judge"); *id*. at 471 (defining "decree" as "any court order"); *id*. at 304 (defining "command" as "[a]n order; a directive"). "That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). Here, given that each of "the neighboring words with which it is associated," *Williams*, 553 U.S. at 294, most commonly refers to a court's directive to specific persons in a particular case, the term "rule" in § 402 should be construed accordingly.

Finally, interpreting the term "rule" to include local court rules would lead to absurd results, especially when § 402 is read in conjunction with § 401. Section § 401 grants federal courts the power to punish acts in contempt of the courts' authority, and is thus closely analogous in purpose to § 402. *Compare* 18 U.S.C. § 401, *with id*. § 402. As discussed above, the two provisions employ identical lists containing the following terms: "lawful writ, process, order, rule, decree, or command." *See* 18 U.S.C. §§ 401, 402. Generally, "[w]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Cooper v. FAA*, 622 F.3d 1016, 1032 (9th Cir. 2010) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion)) (internal quotation marks omitted) (citing *United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc)). As this presumption is appropriate here, we must construe the term "rule" in the same manner under § 401 and § 402.

Section 401 authorizes federal courts to punish "[d]isobedience or resistance" to their "rule[s]," without also requiring, as does § 402, that the act violative of a "rule" also

constitute a state criminal offense. *See* 18 U.S.C. §§ 401, 402. If "rule[s]" encompass local court rules, then, under § 401, a court would be able to fine or imprison attorneys for, let's say, failing to conform to local rules specifying the width of margins, appropriate typeface, or kind of paper used for pleadings. *See, e.g.*, D. Haw. L.R. 10.2 ("All documents presented for filing shall be on white opaque paper of good quality . . . with one inch margins . . . ."); C.D. Cal. L.R. 11-3.1.1 ("A monospaced [type]face may not contain more than 10-1/2 characters per inch."); C.D. Cal. L.R. 11.3.2. ("All documents shall be submitted on opaque, unglazed, white paper (including recycled paper) not less than 13-pound weight."). It is at least exceedingly unlikely that Congress intended to authorize convictions of criminal contempt for disobeying ministerial, generally applicable requirements forbidding low-quality paper or excessively small type.

Moreover, were "rule" read in this fashion, district courts might be able to punish violations of their local rules with contempt but not violations of the Federal Rules of Civil or Criminal Procedure. Those federal rules are not rules promulgated by the punishing court itself—and, in that sense, are not "its . . . rule." *See* 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment . . . such contempt of its authority, *and none other*, as . . . disobedience or resistance to its lawful writ, process, order, rule, decree, or command.") (emphasis added). To avoid this anomaly, perhaps one could view the national civil and criminal procedural rules as rules of each district court for purposes of § 401 and § 402, even though the rules are not actually promulgated by each court. If so, we could start having criminal contempt prosecutions for such trifling oversights as the omission of file numbers from the captions of pleadings, *see* Fed. R. Civ. P. 10(a), and the failure of signing attorneys to include their email addresses on motions, *see* Fed. R. Civ. P. 11(a). Either way—whether the term "rule" in § 401 would allow for criminal prosecutions, fines, and prison terms for violating local district court standing rules but not the Federal Rules, or,

instead, would permit criminal prosecutions simply for violations of the minutia of the Federal Rules of Civil or Criminal Procedure, without any case specific directive or warning by the district court—the results could be nonsensical.

**[10]** For these reasons, we hold that local court rules, including Rules 10-1 and 10-2, do not constitute "rule[s]" within the meaning of § 402 and thus cannot serve as predicates for criminal convictions under that statute. *See also Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). We therefore reverse Kimsey's conviction under § 402.

***

In a colloquy ascribed to Sir Thomas More and his daughter: More's daughter urged her father to arrest someone, saying, "Father, that man's bad." More replied, "There's no law against that. . . . [G]o he should if he was the Devil himself, until he broke the law!"[10]

Here, the government may have proven that Kimsey is, if not the Devil, no saint. But it has failed to persuade us that Kimsey was in criminal contempt under the applicable federal statute.

For the foregoing reasons, we reverse Kimsey's conviction.

**REVERSED.**

---

[10]Robert Bolt, *A Man for All Seasons* 38-39 (Heinemann Educational Publishers 1996) (1960).